EL DI, INC., a Delaware corporation, Defendant Below, Appellant,

v.

The TOWN OF BETHANY BEACH, et al., Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: Oct. 31, 1983.

Decided: April 24, 1984.

James D. Griffin (argued), of Griffin & Hackett, P.A., Georgetown, for defendant below-appellant.

* The restrictive covenant stated:

"This covenant is made expressly subject to and upon the following conditions: viz;: That no intoxicating liquors shall ever be sold on the said lot, that no other than dwelling or cottage shall be erected thereon and but one to each lot, which must be of full size according to the said plan, excepting, however, suitable and necessary

Robert L. Halbrook (argued), of Wilson, Halbrook & Bayard, Georgetown, James B. Tyler, III, Georgetown, Nicholas H. Rodriguez, of Schmittinger & Rodriguez, Dover, for plaintiffs below-appellees.

Before HERRMANN, C.J., HORSEY, MOORE and CHRISTIE, JJ., and STIFTEL, President Judge, constituting the Court en banc.

HERRMANN, Chief Justice for the majority:

This is an appeal from a permanent injunction granted by the Court of Chancery upon the petition of the plaintiffs, The Town of Bethany Beach, et al., prohibiting the defendant, El Di, Inc. ("El Di") from selling alcoholic beverages at Holiday House, a restaurant in Bethany Beach owned and operated by El Di.

### I.

The pertinent facts are as follows:

El Di purchased the Holiday House in 1969. In December 1981, El Di filed an application with the State Alcoholic Beverage Control Commission (the "Commission") for a license to sell alcoholic beverages at the Holiday House. On April 15, 1982, finding "public need and convenience," the Commission granted the Holiday House an on-premises license. The sale of alcoholic beverages at Holiday House began within 10 days of the Commission's approval. Plaintiffs subsequently filed suit to permanently enjoin the sale of alcoholic beverages under the license.

On appeal it is undisputed that the chain of title for the Holiday House lot included restrictive covenants prohibiting both the sale of alcoholic beverages on the property and nonresidential construction.* The

out or back building, which may be erected on the rear of said lot, and no building or buildings shall be erected thereon within ten feet of the front building line of said lot and, if said lot be a corner lot within ten feet of the building line of the side street on which it abuts, and that all buildings erected or to be erected on said lot shall be kept neatly painted; a breach of which

same restriction was placed on property in Bethany Beach as early as 1900 and 1901 when the area was first under development.

As originally conceived, Bethany Beach was to be a quiet beach community. The site was selected at the end of the nineteenth-century by the Christian Missionary Society of Washington, D.C. In 1900, the Bethany Beach Improvement Company ("BBIC") was formed. The BBIC purchased lands, laid out a development and began selling lots. To insure the quiet character of the community, the BBIC placed restrictive covenants on many plots, prohibiting the sale of alcohol and restricting construction to residential cottages. Of the original 180 acre development, however, approximately ⅓ was unrestricted.

The Town of Bethany Beach was officially incorporated in 1909. The municipal limits consisted of 750 acres including the original BBIC land (hereafter the original or "old-Town"), but expanded far beyond the 180 acre BBIC development. The expanded acreage of the newly incorporated Town, combined with the unrestricted plots in the original Town, left only 15 percent of the new Town subject to the restrictive covenants.

Despite the restriction prohibiting commercial building ("no other than a dwelling or cottage shall be erected ..."), commercial development began in the 1920's on property subject to the covenants. This development included numerous inns, restaurants, drug stores, a bank, motels, a town hall, shops selling various items including food, clothing, gifts and novelties and other commercial businesses. Of the 34 commercial buildings presently within the Town limits, 29 are located in the old-Town originally developed by BBIC. Today, Bethany Beach has a permanent population of some 330 residents. In the summer months the population increases to ap-

proximately 10,000 people within the corporate limits and to some 48,000 people within a 4 mile radius. In 1952, the Town enacted a zoning ordinance which established a central commercial district designated C–1 located in the old-Town section. Holiday House is located in this district.

Since El Di purchased Holiday House in 1969, patrons have been permitted to carry their own alcoholic beverages with them into the restaurant to consume with their meals. This "brown-bagging" practice occurred at Holiday House prior to El Di's ownership and at other restaurants in the Town. El Di applied for a license to sell liquor at Holiday House in response to the increased number of customers who were engaging in "brown-bagging" and in the belief that the license would permit restaurant management to control excessive use of alcohol and use by minors. Prior to the time El Di sought a license, alcoholic beverages had been and continue to be readily available for sale at nearby licensed establishments including: one restaurant ½ mile outside the Town limits, 3 restaurants within a 4 mile radius of the Town, and a package store some 200–300 yards from the Holiday House.

The Trial Court granted a stay pending the outcome of this appeal.

## II.

In granting plaintiffs' motion for a permanent injunction, the Court of Chancery rejected defendant's argument that changed conditions in Bethany Beach rendered the restrictive covenants unreasonable and therefore unenforceable. Citing *Restatement of Property*, § 564; *Welshire, Inc. v. Harbison*, Del.Supr., 91 A.2d 404 (1952); and *Cruciano v. Ceccarone*, Del.Ch., 133 A.2d 911 (1957). The Chancery Court found that although the evidence showed a considerable growth since 1900 in both population and the number of

said conditions, or any of them, shall cause said lot to revert to and become again the property of the grantor, his heirs and assigns; and upon such breach of said conditions or restrictions,

the same may be restrained or enjoined in equity by the grantor, his heirs or assigns, or by any co-lot owner in said plan or other party injured by such breach."

buildings in Bethany Beach, "the basic nature of Bethany Beach as a quiet, family oriented resort has not changed." The Court also found that there had been development of commercial activity since 1900, but that this "activity is limited to a small area of Bethany Beach and consists mainly of activities for the convenience and patronage of the residents of Bethany Beach."

The Trial Court also rejected defendant's contention that plaintiffs' acquiescence and abandonment rendered the covenants unenforceable. In this connection, the Court concluded that the practice of "brown-bagging" was not a sale of alcoholic beverages and that, therefore, any failure to enforce the restriction as against the practice did not constitute abandonment or waiver of the restriction.

### III.

We find that the Trial Court erred in holding that the change of conditions was insufficient to negate the restrictive covenant.

A court will not enforce a restrictive covenant where a fundamental change has occurred in the intended character of the neighborhood that renders the benefits underlying imposition of the restrictions incapable of enjoyment. *Welshire v. Harbison,* Del.Supr., 91 A.2d 404 (1952); *1.77 Acres of Land v. State,* Del.Supr., 241 A.2d 513 (1968); *Williams v. Tsiarkezos,* Del. Ch., 272 A.2d 722 (1970). Review of all the facts and circumstances convinces us that the change, since 1901, in the character of that area of the old-Town section now zoned C–1 is so substantial as to justify modification of the deed restriction. We need not determine a change in character of the entire restricted area in order to assess the continued applicability of the covenant to a portion thereof. See *Noyes v. McDonnell,* Okl.Supr., 398 P.2d 838 (1965); *Palmer v. Circle Amusement Co.,* Ct.App.N.J., 130 N.J.Eq. 356, 22 A.2d 241 (1941).

It is uncontradicted that one of the purposes underlying the covenant prohibiting the sale of intoxicating liquors was to maintain a quiet, residential atmosphere in the restricted area. Each of the additional covenants reinforces this objective, including the covenant restricting construction to residential dwellings. The covenants read as a whole evince an intention on the part of the grantor to maintain the residential, seaside character of the community.

But time has not left Bethany Beach the same community its grantors envisioned in 1901. The Town has changed from a church-affiliated residential community to a summer resort visited annually by thousands of tourists. Nowhere is the resultant change in character more evident than in the C–1 section of the old-Town. Plaintiffs argue that this is a relative change only and that there is sufficient evidence to support the Trial Court's findings that the residential character of the community has been maintained and that the covenants continue to benefit the other lot owners. We cannot agree.

In 1909, the 180 acre restricted old-Town section became part of a 750 acre incorporated municipality. Even prior to the Town's incorporation, the BBIC deeded out lots free of the restrictive covenants. After incorporation and partly due to the unrestricted lots deeded out by the BBIC, 85 percent of the land area within the Town was not subject to the restrictions. Significantly, nonresidential uses quickly appeared in the restricted area and today the old-Town section contains almost all of the commercial businesses within the entire Town. Contrast *Whitaker v. Holmes,* Ariz.Supr., 74 Ariz. 30, 243 P.2d 462 (1952) (original grantors specifically provided for continued vitality of the covenants in the event a Town was later established). Moreover, these commercial uses have gone unchallenged for 82 years. Contrast *Humphreys v. Ibach,* N.J.Supr., 110 N.J.Eq. 647, 160 A. 531 (1932).

The change in conditions is also reflected in the Town's decision in 1952 to

zone restricted property, including the lot on which the Holiday House is located, specifically for commercial use. Although a change in zoning is not dispositive as against a private covenant, it is additional evidence of changed community conditions. *Bard v. Rose*, Cal.Dist.Ct.App., 203 Cal. App.2d 232, 21 Cal.Rptr. 382, 384 (1962). *See Owens v. Camfield*, Ark.Ct.App., 1 Ark.App. 295, 614 S.W.2d 698 (1981).

 Time has relaxed not only the strictly residential character of the area, but the pattern of alcohol use and consumption as well. The practice of "brown-bagging" has continued unchallenged for at least twenty years at commercial establishments located on restricted property in the Town. On appeal, plaintiffs rely on the Trial Court finding that the "brown-bagging" practice is irrelevant as evidence of waiver inasmuch as the practice does not involve the sale of intoxicating liquors prohibited by the covenant. We find the "brown-bagging" practice evidence of a significant change in conditions in the community since its inception at the turn of the century. Such consumption of alcohol in public places is now generally tolerated by owners of similarly restricted lots. The license issued to the Holiday House establishment permits the El Di management to better control the availability and consumption of intoxicating liquors on its premises. In view of both the ready availability of alcoholic beverages in the area surrounding the Holiday House and the long-tolerated and increasing use of "brown-bagging," enforcement of the restrictive covenant at this time would only serve to subvert the public interest in the control of the availability and consumption of alcoholic liquors.

Plaintiffs contend that the covenant prohibiting the sale of intoxicating liquors is separate from the other covenants. In the plaintiffs' view, the alcohol sale restriction serves a purpose distinct from the prohibition of nonresidential uses. Plaintiffs argue, therefore, that despite evidence of commercial uses, the alcohol sale restriction provides a substantial benefit to the other lot owners. We find the cases on which plaintiff relies distinguishable:

In *Jameson v. Brown*, 109 F.2d 830 (D.C. Cir.1939), all of the lots were similarly restricted and there was no evidence of waiver or abandonment of the covenant prohibiting the sale of spiritous liquors. The court found evidence of one isolated violation—in contrast to the long-tolerated practice of "brown-bagging" in Bethany Beach. Compare *Alamogordo Improvement Co. v. Prendergast*, N.M.Supr., 45 N.M. 40, 109 P.2d 254 (1940). In *Brookside Community, Inc. v. Williams*, Del.Ch., 290 A.2d 678, *aff'd*, 306 A.2d 711 (1972), the general rule in Delaware is stated as to the effect of a waiver of a separable covenant. The case is distinguishable because here we consider waiver in conjunction with our assessment of the change of conditions in the community. No such change was alleged or addressed in *Williams*. In *Benner v. Tacony Athletic Ass'n*, Pa.Supr., 328 Pa. 577, 196 A. 390 (1938), it was found that commercial encroachments were few and that residential properties still closely surrounded the commercial lots. In Bethany Beach commercial uses have not simply crept in, but have been given official sanction through the 1952 Zoning Ordinance.

It is further argued that the commercial uses are restricted to a small area within the old-Town section. But significantly, the section in which Holiday House is located is entirely commercial. The business uses, the availability of alcohol in close proximity to this section, and the repeated use of "brown-bagging" in the C–1 district render the originally intended benefits of the covenants unattainable in what has become an area detached in character from the strictly residential surroundings to the west.

 In view of the change in conditions in the C–1 district of Bethany Beach, we find it unreasonable and inequitable now to enforce the restrictive covenant. To permit unlimited "brown-bagging" but to prohibit licensed sales of alcoholic liquor, under the

circumstances of this case, is inconsistent with any reasonable application of the restriction and contrary to public policy.

We emphasize that our judgment is confined to the area of the old-Town section zoned C–1. The restrictions in the neighboring residential area are unaffected by the conclusion we reach herein.

\* \* \*

Reversed.

CHRISTIE, Justice, with whom MOORE, Justice, joins, dissenting:

I respectfully disagree with the majority.

I think the evidence supports the conclusion of the Chancellor, as finder of fact, that the basic nature of the community of Bethany Beach has not changed in such a way as to invalidate those restrictions which have continued to protect this community through the years as it has grown. Although some of the restrictions have been ignored and a portion of the community is now used for limited commercial purposes, the evidence shows that Bethany Beach remains a quiet, family-oriented resort where no liquor is sold. I think the conditions of the community are still consistent with the enforcement of a restrictive covenant forbidding the sale of intoxicating beverages.

In my opinion, the toleration of the practice of "brown bagging" does not constitute the abandonment of a longstanding restriction against the sale of alcoholic beverages. The restriction against sales has, in fact, remained intact for more than eighty years and any violations thereof have been short-lived. The fact that alcoholic beverages may be purchased right outside the town is not inconsistent with my view that the quiet-town atmosphere in this small area has not broken down, and that it can and should be preserved. Those who choose to buy land subject to the restrictions should be required to continue to abide by the restrictions.

I think the only real beneficiaries of the failure of the courts to enforce the restric-

tions would be those who plan to benefit commercially.

I also question the propriety of the issuance of a liquor license for the sale of liquor on property which is subject to a specific restrictive covenant against such sales.

I think that restrictive covenants play a vital part in the preservation of neighborhood schemes all over the State, and that a much more complete breakdown of the neighborhood scheme should be required before a court declares that a restriction has become unenforceable.

I would affirm the Chancellor.