NEW CASTLE COUNTY, Subdivision of the State of Delaware, Plaintiff, Respondent,

v.

PIKE CREEK RECREATIONAL SER-VICES, LLC, a Delaware limited liability company, Defendant, Petitioner.

C.A. No. 5969–JW (consolidated with C.A. N10M–12–005 PRW)

Court of Chancery of Delaware

Submitted: June 14, 2013

Decided: September 5, 2013

Corrected: September 6, 2013

Withdrawn and Reissued With Clarifications: December 30, 2013

Max B. Walton, Esquire, Connolly Gallagher LLP, Newark, Delaware, Bernard V. Pepukayi, Esquire, County Attorney, New Castle County Office of Law, Wilmington, Delaware, Attorneys for Plaintiff/Respondent.

Richard P. Beck, Esquire, A. Kimberly Hoffman, Esquire, Morris James LLP, Wilmington, Delaware, Attorneys for Defendant/Petitioner.

Richard L. Abbott, Esquire, Abbott Law Firm, Hockessin, Delaware, Attorney for Interested Parties.

### OPINION

WALLACE, J.

#### I. INTRODUCTION

Plaintiff New Castle County (the "County") moves for partial summary judgment, asking the Court to uphold alleged land use restrictions created by two agreements—a 1964 agreement and a 1969

amendatory agreement (later described and hereinafter referred to collectively as the "Master Plan") that were executed to govern the development of Pike Creek Valley—and thus prevent Defendant Pike Creek Recreational Services ("PCRS") from developing any portion of approximately 177[1] acres that once operated as a golf course.[2] The County argues PCRS must follow the procedural process required by the County's Unified Development Code ("UDC") § 40.31.130, also known as the "Restriction Change Statute," before PCRS can develop any part of the land.[3] PCRS has also moved for partial summary judgment requesting an order from this Court that UDC § 40.31.130 does not apply to the subject land either because no such restrictions exist on that acreage, or because the PCRS development plans would not violate any now-extant restrictions.[4] Both parties were heard at oral argument before this Court[5] in November 2011.

The County first filed a Complaint in November 2010 in the Court of Chancery.[6] It seeks to compel PCRS' compliance with alleged restrictions in the Master Plan and to "maintain and operate an 18–hole golf course."[7] In December 2010, PCRS countered with a mandamus action in Superior Court[8] seeking "plan review, engineering approvals and building permits" for its proposed residential development of the Golf Course (the "Mandamus Action").[9] The action in Chancery[10] was consolidated with the Mandamus Action.[11] For the reasons described below, both Motions for Summary Judgment are **GRANTED, in PART.**

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1964 the four original owners[12] of 1,141 acres in Mill Creek Hundred, now known as Pike Creek Valley, in New Cas-

1. For the purposes of this decision, the approximately 177–acre area at issue is referred to as the "Golf Course."

2. County's Mot. for Partial Summary Judgment (C.A. No. 5969 Docket Item ("D.I.") 49), at 1 [hereinafter N CCo Mot.].

3. *Id.*

4. PCRS Mot. for Partial Summary Judgment (D.I. 52), at 3 [hereinafter PCRS Mot.].

5. Judge John A. Parkins, Jr., specially appointed Vice Chancellor, presiding. Previously the Superior Court had consolidated the current case, C.A. No. 5969, with *Pike Creek Recreational Services, LLC v. New Castle County*, C.A. No. N 10M–12–005, for all purposes. *See Pike Creek Recreational Services v. New Castle County*, Del.Super., C.A. No. 10M–12–005, Parkins, J. (Oct. 11, 2011) (ORDER) (Docket Item ("D.I.*") 2), at 1. On March 25, 2013, the President Judge specially re-assigned C.A. No. N 10M–12–005 to the undersigned "for all purposes until final disposition." Memorandum, Mar. 25, 2013 (D.I.* 11), at 1. And on April 8, 2013 the undersigned was specially appointed a Vice Chan-

cellor by the Chief Justice to preside over the consolidated matters in the Court of Chancery pursuant to Del. Const. Art. II, § 13(2). *New Castle County v. Pike Creek Recreational Services, LLC*, Del.Supr., C.A. No. 5969, Steele, C.J. (Apr. 8, 2013) (ORDER) (D.I. 77), at 1.

6. D.I. 1. The County subsequently filed a First Amended Complaint (D.I. 5) and a Second Amended Complaint (D.I. 11).

7. D.I. 11 at 1–2.

8. C.A. N10M–12–005.

9. PCRS Mot. at 1.

10. C.A. No. 5969.

11. *New Castle County v. Pike Creek Recreational Services*, Del.Super., C.A. No. N10M–12–005, Parkins, J. (Oct. 11, 2011) (ORDER) (D.I.* 2), at 1.

12. Frank A. Robino, Inc., Luigi Fortunato, Inc., Franklin Associates, Inc., and Joseph P. Johnson, Inc.

tle County, operated as Mill Creek Ventures and entered into an agreement to develop the land "pursuant to a comprehensive master plan, applying the principles of a planned unit development." [13] At the time, New Castle County was governed by the Levy Court, and the County's zoning code had not yet evolved to include provisions to accommodate such mixed-use development plans.[14] In order to "permit the [Levy Court] to consider the proposed rezoning in the light of specific proposed uses," [15] the original owners voluntarily entered into the 1964 Agreement [16] which imposed restrictions on the subject acreage in the event that the Levy Court approved the owners' petition for rezoning.[17] The original owners also made the Levy Court a third-party beneficiary of the 1964 Agreement.[18] As such, the Levy Court and its successors were given the power to prospectively enforce the 1964 Agreement.[19] Similarly, any amendments to the 1964 Agreement would require approval by the Levy Court or its successors in interest.[20] With respect to a golf course,

13. Ex. A to NCCo Op. Brf. at 1 [hereinafter "1964 Agreement"]. A "planned unit development" may include "varying densities of residential, light industrial, office research and commercial uses." *Delaware Racing Ass'n v. McMahon*, 340 A.2d 837, 839 (Del. 1975).

14. *See* Ex. E to NCCo Op. Brf. at 1–2.

15. *Id.* at 2.

16. The Agreement conveyed the entirety of 1,000+ acres from the four original owners trading as Mill Creek Ventures to only one, Frank A. Robi no, Inc., for the sum of $10.00. 1964 Agreement at art. 2. The vast majority of the document, evidencing its obvious purpose, was to set forth how that land would and could be developed, who would and could have say over that development, and that it all would become effective "if, but only" if the Levy Court acted favorably toward the then-pending zoning application that would allow development of the planned unit development. *Id.*

17. 1964 Agreement at art. 2–3 ("The Developer does hereby, for itself, its successors, transferees and assigns, impose the restrictions, limitations and covenants, with respect to use and occupancy hereinafter set forth in detail upon the land herein above described ... being the SUBJECT ACREAGE."). PCRS has argued that the 1964 Agreement constitutes an illegal zoning by contract. *See Hartman v. Buckson*, 467 A.2d 694, 700 (Del.Ch.1983) (compromise agreement between developer and town council was "an invalid ultra vires exercise of municipal authority"). *But see Wilmington Sixth Dist. Cmty. Comm. v. Petti-*

*naro Enter.*, 1988 WL 116496, at *4 (Del. Ch. Oct. 27, 1988) ("Contract zoning is usually distinguished from conditional zoning by a finding that in contract zoning, there is a bilateral agreement committing the zoning authority to a legally binding promise while in conditional zoning the zoning authority does not legally bind itself to rezone.") (assuming without deciding that conditional zoning is legal in Delaware). The County was not a party to the 1964 Agreement, nor did the 1964 Agreement bind the County to rezone the land; the 1964 Agreement merely establishes a scheme of voluntary restrictions which were conditioned upon the County's passing a zoning modification petition. 1964 Agreement at art. 3.

18. 1964 Agreement at art. 3 ("Said restrictions shall be for the benefit of the parties hereto and for the benefit of the Levy Court of New Castle County, Delaware, or any governmental body which may hereafter have final zoning jurisdiction over the SUBJECT ACREAGE....").

19. *Id.* at art. 5 ("[T]he LEVY COURT [may] instruct[] its County Building Inspector to refuse to issue a building permit if the issuance of such permit would violate ... any of the terms and provisions of this agreement.").

20. *Id.* at art. 3, art. 5 ("The commitments and promises of the Developer to the Levy Court of New Castle County, shall inure to the benefit of and be enforceable by the Levy Court of New Castle County, or any successor organization ... which may hereafter be the governmental body having final jurisdiction over the subject acreage....").

the 1964 Agreement set aside open space for "a par three golf course or other recreational use."[21] The original owners requested the area set aside for the par-three golf to be zoned commercial, and in return covenanted to use the land for either commercial recreational purpose or non-profit recreational use only.[22] In December 1964, the Levy Court approved the original owners' development plan as described in the 1964 Agreement and re-zoned the subject acreage. As a result, the voluntary restrictions in the 1964 Agreement became effective. The 1964 Agreement was recorded in the Recorder of Deeds office.[23]

In 1969 the original contracting parties executed an amendment to the 1964 agreement (the "1969 Amendatory Agreement").[24] The 1969 Amendatory Agreement had several distinct objectives: (1) to acknowledge New Castle County Council (the "County Council") as the Levy Court's successor in interest, and thus the governmental organization with final jurisdiction over the subject acreage;[25] (2) to identify

changes in the corporate identities of two of the original owners;[26] and (3) to expand the "SUBJECT ACREAGE" from approximately 1,141 acres to approximately 1,364 acres.[27] As required by the 1964 Agreement, the 1969 Amendatory Agreement was subject to the County Council's approval.[28] And, just as the restrictions in the 1964 Agreement were contingent upon the County approving certain rezoning, the 1969 Amendatory Agreement was contingent upon the County approving additional zoning changes.[29]

Whereas the 1964 Agreement had contemplated a par-three golf course, the 1969 Amendatory Agreement required the "set aside and hold[ing] throughout the course of development of the entire SUBJECT ACREAGE the following land use[] ... [o]pen spaces [ ] including 130 acres set aside for an 18–hole golf course...."[30] In addition, the contracting parties agreed that 85 additional acres would be set aside as "non-golf open space" for a total of 215 acres set aside for open or recreational

21. *Id.* at art. 10; *see also id.* at art. 12 ("[A]s the only exception to the foregoing, the area shown on the updated master plan set aside for a par three golf course if zoned commercial shall only be used for a recreational purpose.").

22. *Id.* at art. 10.

23. *See id.* at pp. 1–12 (the 1964 Agreement was retrieved from the Recorder of Deeds). Between 1964 and 1969, several zoning adjustments were made that did not require an amendment to the 1964 Agreement. Second Amended Complaint at ¶ 25. During that same 5–year time period, the owners developed approximately 265 acres of the "SUBJECT ACREAGE," i.e. PikeCreek Valley. *Id.* at ¶ 26.

24. Ex. B. to NCCo Op. Brf. [hereinafter "1969 Amendatory Agreement"].

25. *Id.* at p. 2.

26. *Id.* ("FRANKLIN ASSOCIATES, INC., changed to LEON N. WEINER AND ASSOCIATES, INC., and JOSEPH P. JOHNSON, INC., to PIKECREEK, INC.").

27. *Id.* The new acreage estimate adjusted the original based on a subsequent and more thorough survey and increased the overall acreage to include six additional parcels purchased after the owners executed the 1964 Agreement. *Id.*

28. *Id.* at p. 1.

29. *Id.* at art. 2 (The "updated tentative comprehensive master plan" was "subject to reasonable and beneficial variations and changes to be approved by the New Castle County Council in a ... zoning proceeding.").

30. *Id.* at art. 3 (amending Article 7 of the 1964 Agreement), art. 7 (amending Article 10 of the 1964 Agreement), art. 9 (amending Article 12 of the 1964 Agreement).

738

space.[31] At the time of covenanting, the parties agreed that if construction of the golf course did not begin within five years, "the open space set-aside for the [golf course] shall be devoted to uses approved by the Department of Planning and the New Castle County Council."[32] The owners' requested zoning changes were approved by the County Council in early 1970.[33] The voluntary restrictions in the 1969 Amendatory Agreement then became effective.[34]

Nearly two years later, in September 1971, the then-owners recorded a plan for Pike Creek Golf Course, which established "private open space ... in accordance with the [1964] agreement as amended," and which again also designated the County as a third-party beneficiary.[35] In order to develop the open space set-aside as a golf course without losing the land's residential zoning designation, the owners sought and were granted a special exception by the

County.[36] Soon thereafter, the plot was sold to Pike Creek Valley Country Club.[37]

In 1970, the owners had prepared an "Approved Tentative Master Plan Pike Creek Valley,"[38] (the "Distributed Master Plan") which developers distributed to prospective purchasers of Pike Creek residential units.[39] The Distributed Master Plan included a signature block whereby lot purchasers acknowledged that the Distributed Master Plan derived from the Master Plan and could be changed only with approval by the County Council.[40] In the decade or so immediately following, a series of revised subdivision plans document minor modifications to the Golf Course, some containing language establishing the Golf Course as "private open space" in accordance with the Master Plan.[41] Subsequent recorded plans, however, made no mention of the two Agreements, and did not make reference to the "private open space," as previous plans had done.[42]

31. *Id.* at art. 3 (amending Article 7 of the 1964 Agreement).

32. *Id.* at art. 7 (the Dep't of Planning is now known as the Dep't of Land Use).

33. *See* Ordinance No. 69–75. Appendix in Support of New Castle County's Proposed Findings of Fact and Conclusions of Law, at 21–22 [hereinafter A___]. The County Council relied upon the 1969 Amendatory Agreement in approving the zoning changes. Recommendation on Proposed Ordinance 7–8–69–6–C, Nov. 18, 1969. [A54].

34. Nevertheless, the 1969 Amendatory Agreement was never recorded. *See* NCCo Proposed Findings of Fact and Conclusions of Law, June 11, 2013, at ¶ 10.

35. Microfilm 1845, Sept. 1971. [A 73].

36. Notice of Decision re: Application 2610–A, Oct. 2, 1970. Ex. D. to Second Amended Complaint.

37. Deed, March 2, 1976. Ex. H to Aff. of A. Kimberly Hoffman, Aug. 29, 2011.

38. *See* [A334].

39. *See, e.g.,* Mot. to Intervene (D.I. 67), at ¶ 9.

40. *Id.* Several residents of Pike Creek Valley (the "Interested Parties") have moved to intervene in this action, claiming they relied on the representations made in the Distributed Master Plan, and therefore have standing to assert specific claims to block PCRS from developing the Golf Course. Mot. to Intervene (D.I. 67), at ¶¶ 10–14; *see,* Part V.B.5., *infra.*

41. Microfilm 2456, Nov. 1973 (A 74); Microfilm 4737, Jan. 1978 (A 75); Microfilm 5514, Mar.1980(A76); *see also* PCRS Supp. Letter, Nov. 23, 2011 (D.I. 68) (and accompanying exhibits).

42. The subsequent plans were filed in 1989, 1993, 2007, and 2009. *See also* PCRS Supp.

In 1980, G.R.G. Realty Co. ("G.R.G."), then-owner of the Golf Course, sought approval to subdivide twenty townhouse lots from a portion thereof along Hogan Drive (the "Hogan Drive Plan"). In response to the County's refusal to review its plans for the Hogan Drive Plan, G.R.G. filed a mandamus action in Superior Court.[43] The limited question then decided by the Court was whether such writ should issue.[44]

The Court's conditional writ ordered the Department of Planning to carry out its statutory duty to review the Hogan Drive Plan "as to content."[45] The Court also instructed the Department of Planning to "make it clear in its decision that it is not passing upon the issues which fall outside its assigned duties."[46] As a result, after the Department of Planning reviewed and approved the Hogan Drive Plan in 1982, it placed the following note on the recorded plan:

> This plan has been reviewed as to content and compliance with the New Castle County Subdivision and Land Development Regulations. The Department of Planning has not reviewed the Plan as to compliance with the 1964 Agreement or the 1969 Amendatory Agreement of record pertaining to the development of the Pike Creek Valley Community or any other applicable agreement per let-

ter opinion of the Superior Court dated 12/30/81 re: G.R.G. Realty vs. New Castle County 81M–MR–18.

The Hogan Drive Plan was recorded thereafter, and each of the twenty lots assigned a tax parcel number,[47] but the County took additional action to block development of Hogan Drive. The County Council's attorney directed the County Director of Public Works not to issue any building permits related to the recorded plan.[48] The County Council also adopted Resolution 82–092 in which it, *inter alia*, authorized the County to join a lawsuit filed by Pike Creek Valley residents.[49] That lawsuit was dismissed, however, after G.R.G. went bankrupt, and before the County joined.

Three Little Bakers, Inc. ("Three Little Bakers") purchased the Golf Course from G.R.G. in December 1982.[50] In 1985, in order to entice the County to rezone portions of the 170 + acres they owned, Three Little Bakers recorded a declaration (the "1985 Declaration") through which it voluntarily entered into a series of covenants restricting the use of the subject land.[51] The 1985 Declaration established "covenants running with the land . . . binding upon the Declarant, its successors and assigns, and . . . for the benefit of New Castle County, its successors and as-

Letter, Nov. 23, 2011 (D.I. 68) (and accompanying exhibits).

**43.** *G.R.G. Realty Co. v. New Castle County*, 1981 WL 697909 (Del. Super Ct. Dec. 30, 1981) . *See* Part III, *infra*.

**44.** *G.R.G. Realty*, 1981 WL 697909, at * 1.

**45.** *Id.* at * 2.

**46.** *Id.* at * 3.

**47.** *See* Annual Billing Statements, New Castle County, Local County and School Taxes. Ex. N to Aff. of A. Kimberly Hoffman, Aug. 29, 2011.

**48.** Cty. Atty. Memorandum, Mar. 25, 1982. [A86].

**49.** Resolution 82–092, Apr. 13, 1982. [A87–88]. The suit in question was *Pike Creek Valley Civic League v. GRG Realty*, C.A. No. 6768 (Del. Ch.). In the Resolution, the County conceded that the question of whether the then-proposed Golf Course development plan violated the Master Plan was "a question of law which must be resolved by the courts. . . ." *Id.* [A88].

**50.** 1985 Declaration, May 24, 1985. [A90].

**51.** *Id.* [A89–103].

signs."[52] Specifically, Three Little Bakers covenanted to restrict the commercial development on the land to "a restaurant, golf course, club house, pro shop, parking lot, and uses allied, ancillary and accessory to said uses, and to the golf course."[53] No changes were to be made "without the prior consent of New Castle County Council...." Finally, the 1985 Declaration stated that any rezoning would not prejudice the County, the County Council, or civic associations with respect to "agreements, restrictions, easements, conditions or other matters relating to the Pike Creek Golf Course."[54]

The 1985 Declaration was recorded, and the County rezoned a portion of the Three Little Bakers' land.[55] Three Little Bakers operated the Golf Course until 2008, when the property was sold to the current owners, PCRS.[56] At no time prior to selling the Golf Course did Three Little Bakers attempt residential development of the twenty Hogan Drive lots.

In 2008, prior to the sale of the land, the title to the Three Little Bakers property was divided in order to separate the Golf Course from the other operations on the land.[57] PCRS took title to the Golf Course, including the Hogan Drive lots, while Pike Creek Healthcare Services LLC ("PC Healthcare") took title to the remaining land.[58] That remainder was commercially-zoned.[59] In order to build a nursing home facility, PC Healthcare applied to have the restrictions contained in the Master Plan and the 1985 Declaration removed.[60] Pursuant to the County's UDC[61] § 40.31.130, the "Restriction Change Statute," which states "any amendment to a declaration of restrictions to which the County is either a party or a beneficiary of the covenants therein shall follow the [statutory] procedure," PC Healthcare submitted its deed restriction change request to the Department of Land Use.[62] The Department of Land Use recommended the change to the Planning Board, which also endorsed the change to the County Council.[63] On July 8, 2008, the County Council formally removed any deed restrictions on the commercially-zoned portion of the land that originated from either the Master Plan or the 1985 Declaration.[64] The Golf Course was unaffected by this 2008 deed change.[65]

52. *Id.* [A89].

53. *Id.*

54. *Id.* [A90].

55. Resolution 08–131, July 8, 2008. [A181].

56. *See* Deed–in–Lieu of Foreclosure, Apr. 15, 2008. [A123].

57. *See Id.*

58. *See* Ex. A to Deed–in–Lieu of Foreclosure, Aug. 15, 2008 ("Excepting out from Parcel 1 that certain piece of land consisting of approximately 5.3 acres, conveyed to Pike Creek Healthcare Services LLC ... to be recorded separately."). [A132].

59. *Id.*

60. *See* Recommendation Deed Restriction Change, May 20, 2008. [A177–80].

61. The County adopted the UDC on December 31, 1997. *See* NCCo Code Chapter 40. [A118]. Section 40.31.130 applies to any deed restriction change request where "the County is either a party to or a beneficiary of the covenants created...." *Id.*

62. *See* Recommendation Deed Restriction Change, May 20, 2008. [A179].

63. *Id.*

64. Resolution 08–131, July 8, 2008. [A181–83]; *see* Recommendation Deed Restriction Change, May 20, 2008. [A 177–80].

65. Recommendation Deed Restriction Change, May 20, 2008 ("The proposed deed restrictions will have no effect on the 168.7–

The Golf Course's current owners, PCRS, shut it down in 2010, intending to construct thereon the Terraces at Pike Creek (the "Terraces"), a mixed-use development comprised of 288 residential dwellings [66] and commercial buildings totaling 62,000 square feet.[67] As a prelude, PCRS first submitted engineering plans for the development of the twenty Hogan Drive lots.[68] The County responded with a letter dated September 23, 2010, in which it notified PCRS that no approvals could be granted until PCRS could show that the development of Hogan Drive would not violate "any other deed restrictions affecting the property." [69] PCRS filed an appeal from the September 2010 letter with the County Planning Board,[70] and as a result the County review process was put on hold.[71] With its appeal pending, PCRS submitted additional engineering drawings and applications for Hogan Drive on October 14, 2010.

On November 9, 2010, before the County took action on the appeal, New Castle County Council adopted Resolution 10–197, which authorized legal action against PCRS and asserted the County's main contention that the Master Plan prohibited any development on the entirety of the

Golf Court as it was configured, including the Hogan Drive lots.[72] The resolution also directed the Land Use Department not to issue PCRS engineering approvals or building permits for residential or other construction.[73] On the same day, the County filed its Complaint in the Court of Chancery, arguing that PCRS' development plan for the shuttered Golf Course violated the applicable restrictions, covenants, and dedications.[74]

PCRS countered with a petition for a writ of mandamus filed in Superior Court on December 1, 2010, seeking a court order directing the County to review the engineering plans and applications. Nearly a week later, the County Council adopted Resolution 10–217,[75] which corrected and amended Resolution 10–197, and filed its First Verified Amended Complaint in the Chancery action. In December 2010, the County, through counsel, notified PCRS that it would review the plans, but simultaneously told PCRS that no building permits would issue until the County approved, pursuant to the Restriction Change Statute, the deed restriction changes it deemed necessary.[76] Additional appeals of County agency decisions were stayed by this Court's order.[77]

---

acre parcel containing the golf course, and it should be noted that the original deed restrictions for the Pike Creek Golf Course will still apply to this parcel."). [A178].

66. Including 130 townhouses, 42 semi-detached dwellings, 44 single family detached dwellings, and 72 condominiums. Dep't of Land Use Exploratory Sketch Plan Review Report, July 8, 2011. [A314].

67. Id.

68. See Dep't of Land Use Letter, Sept. 23, 2010. [A303].

69. Id. [A303–04].

70. PCRS Letter re: Appeal from Land Use Dep't Letter Dated Sept. 23, 2010, Oct. 13, 2010. [A305–09].

71. Ex. A to Aff. of George O. Haggerty, Jr., Sept. 6, 2011. [A321].

72. Appendix to PCRS Op. Brf. in Support of Pet. for Writ of Mandamus, Aug. 5, 2011, at 123–24. See D.I.* 1.

73. Id.

74. See Complaint (D.I. 1).

75. Resolution No. 10–217, Dec. 14, 2010. [A310].

76. NCCo Letter, Dec. 28, 2010. [A393–94].

77. At a scheduling conference on July 29, 2011, the Court stayed proceedings in Pike Creek Recreational Services, LLC v. New Castle County, C.A. No. N11A–02–002 and Pike Creek

Immediately before this Court are the remaining actions: (1) the County's Chancery action seeking equitable relief in the form of a ruling that PCRS is required to maintain and operate an 18–hole golf course on the existing approximately 177 acres previously known as the Pike Creek Golf Course;[78] and (2) PCRS' mandamus action seeking a court order instructing the County to review and approve its proposed plans for both the Hogan Drive lots and the Terraces. This decision also addresses the Motion to Intervene, filed in November 2011, by several residents of Pike Creek Valley.[79] Yet, before the Court considers the merits of each argument, it is first necessary to review several prior decisions, which address the 1964 and 1969 Agreements' effects, and which the parties frequently cite as precedential to the instant case.

### III. PRIOR JUDICIAL PROCEEDINGS

The development of Pike Creek Valley has a tortured legal history. The interpretation of the various agreements and the Pike Creek Valley Master Plan has been the subject of several notable decisions in the nearly 50 years since the 1964 Agreement was first memorialized. The first such decision was issued by the Delaware Supreme Court in 1975. In *New Castle County v. Richeson*,[80] the Supreme Court held that the ultimate decision in a dispute over whether any proposed plans for the Pike Creek Valley conformed to the Master Plan was properly left to the courts, not the New Castle County Planning Board.[81]

Six years later, the Superior Court addressed a different issue: whether the Court could compel the Department of Planning to review and act on G.R.G.'s plan to subdivide a portion of what was then approximately 199 acres on which the Golf Course was situated.[82] G.R.G., which had purchased the Golf Course in 1980, intended to develop 8.7 acres of the 199 for residential use, and to re-design the Golf Course around the new construction.[83] The County's Department of Planning argued, however, that it was not compelled to review and act upon G.R.G.'s submissions because G.R.G. had not secured con-

---

*Recreational Services, LLC v. New Castle County*, C.A. No. N11A–05–015, each of which seeks common law certiorari review of New Castle County Planning Board decisions related to PCRS' land development applications. Tr. of Scheduling Conference, July 29, 2011, at p. 20; *see New Castle County v. Pike Creek Recreational Services, LLC*, Del.Super., C.A. No. 5969–JW, Wallace, J. (Sept. 5, 2013) (ORDER) (D.I. 102) (implementing the Court's July 29, 2011 rulings with modifications).

78. On September 6, 2013, the Court delivered its order granting partial summary judgment on this issue. *New Castle County v. Pike Creek Recreational Services*, 77 A.3d 274, 277–78, 310 (Del.Ch.2013). The County timely filed a motion for reargument or clarification of that decision under Court of Chancery Rule 59(f). The Court has granted that motion, in part, now withdraws its September 6, 2013 Opinion, and hereby reissues this Opinion with clarifications. *See New Castle County v. Pike*

*Creek Recreational Services*, 2013 WL 6904387, at *2 (Del. Ch. Dec. 30, 2013) (granting, in part, County's motion for clarification).

79. *See* Part V.B.5., *infra.*

80. 347 A.2d 135 (Del.1975).

81. *Id.* at 137 ("As the controversy in this case clearly arose out of interpretation and enforcement of the master plan, and did not in any way concern the substantive provision of the Subdivision Regulations, we hold that the dispute over conformity with the master plan was beyond the scope of the Board's review power.").

82. *G.R.G. Realty Co. v. New Castle County*, 1981 WL 697909, at * 1 (Del.Super. Ct. Dec. 30, 1981).

83. *Id.*

sent from the County Council, successor in interest to the Levy Court and third-party beneficiary of the Master Plan.[84] The Superior Court disagreed and compelled the Department of Planning to review G.R.G.'s proposal as to content only, with the caveat that the Department of Planning "make it clear in its decision that [the Department of Planning] is not passing upon the issues which fall outside its assigned duties."[85] The Department of Planning could not avoid its statutory duty to review the plans, and determining whether the plans were in accordance with the Master Plan was outside the Department of Planning's jurisdiction.[86] Therefore, the County's Department of Planning, under *G.R.G.* and *Richeson,* was both compelled to conduct its review and limited in its regulatory review of the then-pending development plan's content.[87] The issue of whether the then-planned development was in accordance with the Master Plan was a question properly left to the Court.[88]

In *Regency Group, Inc. v. New Castle County,* the Court of Chancery addressed yet another Pike Creek Valley development issue: whether a designation on the Master Plan map alone creates a restrictive covenant.[89] In *Regency,* the County argued that the designation on the Master Plan map of certain acreage as "Motor Inn Site" created a covenant that restricted use of that acreage to a motor inn.[90] Again, the Court did not agree with the County and found that enforcing a restrictive covenant against Regency in particular, would be "arbitrary and inequitable," in light of the fact that the County had neglected to enforce other similar designations on the Master Plan map as restrictive covenants.[91] Relying on the following clause from the 1964 Agreement, the Court found that the specific designation on the planning map of "Motor Inn Site" was not controlling, and that portions of the subject land zoned for business may be used in any way that accorded with the County zoning code:

> The acreage set aside for commercial use on the updated Master Plan and rezoned for that purpose; whether the classifications be G–1, C–2, R–C, or C–3, shall be utilized for the land uses and purposes described in the zoning Code of New Castle County as the same now is or may hereafter be amended to restate such uses; provided, however, and as the *only exception to the foregoing, the area shown on the updated Master Plan set aside for a par 3 golf course if zoned commercial shall only be used for a recreational purpose.*[92]

84. *Id.* at *3; *see Richeson,* 347 A.2d at 136 ("[I]n addition to all controls exercised by the Regional Planning Commission ... under its existing statutory authority, practice and procedure, such commission shall also require that each plat conform to the concept of the updated master plan ...." (quoting the 1964 Agreement)).

85. *G.R.G. Realty,* 1981 WL 697909, at *3 ("[I]f a controversy arises out of a master plan and rights which may have been created by it, that controversy is 'beyond the scope of the Board's review power.'" (quoting *Richeson,* 347 A.2d at 137)).

86. *Id.*

87. *Id.*

88. *Id.* Consequently, the Court granted G.R.G.'s request for a writ of mandamus with certain conditions. *Id.* at *4.

89. *Regency Group, Inc. v. New Castle County,* 1987 WL 1461610, at * 1 (Del. Ch. Dec. 3, 1987).

90. *Id.*

91. *Id.* at * 2.

92. *Id.* at * 1 (emphasis added); *see* 1964 Agreement at art. 12.

In determining that the "Motor Inn Site" map designation did not constitute a restrictive covenant, the Court did not address the primary question raised here: whether the 1964 Agreement and 1969 Amendatory Agreement created a restrictive covenant with respect to the entirety of the acreage previously operated as the Golf Course.[93]

## IV. STANDARD OF REVIEW

This Court cannot grant either party's motion for summary judgment "unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[94] The moving party has the burden of showing that there is no genuine issue of material fact.[95] If that burden is met, the non-moving party must demonstrate that "there is a genuine issue for trial."[96] And in determining whether there is, the Court must view the facts in the light most favorable to the non-moving party.[97]

Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the. merits based on the record submitted with the motions."[98] Where cross-motions for summary judgment are filed, however, and an issue of material fact exists, summary judgment is not appropriate.[99] In its evaluation of whether there is a genuine issue of material fact, the Court should evaluate each motion independently.[100] Where it seems prudent to make a more thorough inquiry into the facts, summary judgment is inappropriate.[101]

## V. DISCUSSION

### A. The Law of the Case

▮ New Castle County argues that the Court's oral rulings of November 16, 2011 should not be disturbed, while PCRS argues that the Court should reconsider those 2011 bench rulings. A successor judge overruling a decision of a predecessor judge of the same Court is strongly disfavored.[102] Such a situation is guided by

93. Land that was also subject to the 1964 and 1969 Agreements was at the center of yet another matter in *State v. The Regency Group, Inc.*, 598 A.2d 1123 (Del.Super.Ct.1991), but the Court in that opinion did not address the questions posed here.

94. *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del.1997) (citing *Playtex FP, Inc. v. Columbia Cas. Co.*, 622 A.2d 1074, 1076 (Del.Super.Ct.1992)); *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at * 10 (Del. Ch. Aug. 9, 2012); *see* Ct. Ch. R. 56(c); Del.Super. Ct. Civ. R. 56.

95. *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

96. Ct. Ch. R. 56(e); *see also Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del.Ch. 1979) ("If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight.").

97. *Tanzer*, 402 A.2d at 385 (citing *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del.Super.Ct.1977)).

98. Ct. Ch. R. 56(h).

99. *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del.Ch.2008).

100. *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 167 (Del.Ch.2003).

101. *Pathmark Stores, Inc. v. 3821 Associates, L.P.*, 663 A.2d 1189, 1191 (Del.Ch.1995) ("[S]ummary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

102. *Frank G.W. v. Carol M.W.*, 457 A.2d 715, 718 (Del.1983) ("[W]e want to emphasize that we take a dim view of a successor judge in a

the doctrine of the law of the case so as to promote "fundamental fairness and ... judicial efficiency." [103] Yet unlike *res judicata*, the "law of the case doctrine is not inflexible ... it not an *absolute* bar to reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances." [104] This is to ensure that, especially where the case is taken on by a successor judge, the parties are not "entrapped by varying philosophies of different judges of the same Court in the case." [105]

Based on the merits of the arguments presented to the Court in November 2011 and in subsequent briefing, the Court adopts the oral rulings of the November 2011 hearing in all instances except in those extraordinary circumstances where justice demands revisiting the merits of the parties' claims. This is the Court's decision on summary judgment in the Chancery Action and final judgment in the

Mandamus Action, as those present the issues that the parties have agreed are ripe for decision at this point.

## B. The Master Plan created a restrictive covenant on the Golf Course that runs with the land.

Courts generally favor the free use of land. [106] Clearly, restrictive covenants, such as the ones alleged here, interfere with free use. [107] To mediate the "tension between protecting neighboring property owners' expectations for their community and the rights of landowners to use their property as they may lawfully choose," courts have developed precise rules to govern restrictive covenants. [108] Specifically, "[restrictive covenants] are recognized and enforced ... where the parties' intent is clear and the restrictions are reasonable." [109] To determine the intent of the parties, the Court must look to the plain meaning of the restrictive covenant or deed restriction. [110] "[C]ovenants

single case overruling a decision of his predecessor."). It is well-settled that once a decision is rendered by the same court that decision should stand. *May v. Bigmar, Inc.* 838 A.2d 285, n. 8 (Del. Ch.2003) ("The 'law of the case' doctrine requires that issues already decided by the same court should be adopted without relitigation, and once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears." (citation omitted) (internal quotation marks omitted)).

103. *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994). This is especially true in Delaware where often more than one judge will preside over an individual case during its pendency. *Frank G.W.*, 457 A.2d at 719 ("Considerations of courtesy and comity are particularly relevant in Delaware where it is not unusual for our Superior Court to have various judges involved at different stages of protracted cases. Lengthy Family Court cases and Court of Chancery cases not infrequently have similar dual or multi-judge participation.").

104. *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1181 (Del.2000) (emphasis in original). Still, a successor judge should only depart from the general rule in "extraordinary circumstances." *Frank G.W.*, 457 A.2d at 719 (citing *Wilmington Med. Ctr., Inc. v. Coleman*, 298 A.2d 320, 322 (Del.Super.Ct.1972)).

105. *Frank G.W.*, 457 A.2d at 719.

106. *Gammons v. Kennett Park Development*, 61 A.2d 391, 397 (Del.Ch.1948).

107. *Greylag 4 Maintenance Corp. v. Lynch-James*, 2004 WL 2694905, at *5 (Del. Ch. Oct. 6, 2004); *Gammons*, 61 A.2d at 391.

108. *Greylag*, 2004 WL 2694905, at * 5.

109. *Chambers v. Centerville Tract No. 2 Maintenance Corp.*, 1984 WL 19485, at *2 (Del. Ch. May 31, 1984).

110. *Mendenhall Village Single Homes Ass'n v. Harrington*, 1993 WL 257377, at * 2 (Del. Ch. June 16, 1993).

restricting the free use of property must be strictly construed."[111]

■■ "[R]estrictive covenants may be enforced against a purchaser only if he or she had notice, either actual or constructive, of their existence."[112] Importantly, "[b]uyers with knowledge or the means of gaining knowledge of covenants restricting use of the land they propose to purchase cannot effectively object to the enforcement of such covenants when they are reasonable, realistic and are fairly administered."[113] Finally, as a general rule, the party advocating for the land use restriction bears the burden of demonstrating the restriction is valid and enforceable.[114]

The County argues the Master Plan establishes the original owners' clear and unambiguous intent to create restrictions that run with the land. Thus the County contends it is entitled to summary judgment on this issue. PCRS opposes the County's interpretation of the Master Plan as demonstrating a clear intent to create enforceable restrictions that run with the land. Because the issue of intent is disputed, PCRS contends, summary judgment is not warranted on those restrictions.

The purpose of the 1964 Agreement and 1969 Amendment was to memorialize a land-use plan across more than a thousand acres in Pike Creek Valley, in order to entice the County to approve the original owners' multi-use community development plan. The Agreements evidence a clear intent by the original owners to balance residential and commercial construction with open and recreational space for the benefit of the County's residents.[115] To that end, the original owners covenanted to set aside a certain amount of open space and to provide an option to construct a golf course on a portion of that otherwise undeveloped land. While the 1969 Amendatory Agreement indicates a set-aside of 215 acres[116] of open space, the Court has not been asked, nor has a record been developed that would allow the Court to rule on the modern-day application and meaning of the entirety of that set-aside. Rather, the parties' contentions surround the current 177± acres owned by PCRS, the *entirety* of which the County has argued must **operate** as a golf course. Thus, for these cross summary judgment motions, the Court's focus is specifically on the golf course restriction created by the 1964 and 1969 Agreements.

**111.** *Regency Group, Inc. v. New Castle County*, 1987 WL 1461610, at *1 (Del. Ch. Dec. 3, 1987).

**112.** *Mendenhall Village*, 1993 WL 257377, at *2. Actual notice suggests the purchaser is aware of the deed restriction, while constructive notice suggests there is a properly recorded deed or other instrument that includes details of the restriction and which is readily accessible via a routine title search. *Greylag*, 2004 WL 2694905, at * 5.

**113.** *Alliegro v. Home Owners of Edgewood Hills, Inc.*, 122 A.2d 910, 912 (Del.Ch.1956).

**114.** *Id.* ("It is well established that restrictions in deeds will be construed strictly against a person who seeks to place such impediments in the way of the normal purchase and sale of land."); *Gammons v. Kennett Park Development*, 61 A.2d 391, 397 (Del. Ch.1948) ("[T]he settled policy of the law . . . favors . . . plac[ing] the burden of establishing the existence and the right to the benefit of a restriction upon him who asserts it.").

**115.** *See e.g.*, 1964 Agreement at art. 7; 1969 Amendatory Agreement at art. 3 (amending Article 7 of the 1964 Agreement).

**116.** This included the 130–acre golf course set-aside and 85 additional acres. *See* 1969 Amendatory Agreement at art. 3 (amending Article 7 of the 1964 Agreement), art. 7 (amending Article 10 of the 1964 Agreement).

■ In construing restrictive covenants, the Court must, where possible, give effect to the plain meaning of the language by the grantor. [117] Article 3 of the 1964 Agreement explicitly states the original owners' intent to (a) impose land use restrictions, and (b) bind themselves and their successors in interest: "The DEVELOPER does hereby, for itself, its successors, transferees and assigns, impose the restrictions, limitations and covenants, with respect to use and occupancy hereinafter set forth in detail upon ... the SUBJECT ACREAGE." There can be no mistaking the intent of the original owners to institute a series of restrictive covenants that would run with the land.

The 1964 and 1969 Agreements, by their plain and unambiguous language, also evidence the original owners' clear intent to set aside, or dedicate, certain acreage as open space. Article 7 of the 1964 Agreement states: "DEVELOPER, its successors and assigns, will set aside and hold throughout the course of development of the entire SUBJECT ACREAGE the following land uses irrespective of the ultimate zoning of the SUBJECT ACREAGE: ... Open Spaces, 158.0 acres minimum." [118] The 1969 Amendatory Agreement modifies Article 7 so that the open space set-aside, irrespective of the ultimate

zoning of the subject acreage, is described as "Open spaces (including 130 acres set aside for an 18–hole golf course and 85 acres [ 10% of net residential lands which shall be non-golf open space] ), 215 acres." [119] The parties' language in both agreements clearly evidences the intent to dedicate open space.

1. The Master Plan does not require PCRS to *operate* the Golf Course, but does preclude development on 130 acres of the set-aside open space.[120]

■ The County argues that the 1969 Amendatory Agreement plainly requires *operation* of an 18–hole golf course on the set-aside open space.[121] PCRS counters that nothing in either the 1964 Agreement or 1969 Amendatory Agreement requires a golf course to be constructed, let alone operated in perpetuity.[122] The restrictive covenant must be construed as a whole so that none of the individual provisions of the covenant themselves become "illusory or meaningless." [123] Reading the two Agreements as a whole, and strictly construing the plain meaning of the golf course restriction, the Court must conclude there is a "set-aside for a specific use of 130 acres" of the subject acreage. That

117. *Monigle v. Darlington,* 81 A.2d 129, 131 (Del.Ch.1951) (citing *Gibson v. Main,* 129 A. 259, 260 (Del.Ch.1925); *Daniels Gardens v. Hilyard,* 49 A.2d 721, 722–23 (Del. Ch.1946) (same)).

118. 1964 Agreement at art. 7.

119. 1969 Amendatory Agreement at art. 3 (amending art. 7 of the 1964 Agreement).

120. On November 16, 2011, the previous Judge indicated that his "intention" was to rule that PCRS is prevented from building on 177 acres, less the minimal acreage of the Hogan Drive development. Oral Arg. Tr., Nov. 16, 2011, at 186. That *intended* ruling was made, however, prior to the submission of supplemental briefings by both the County

and PCRS. A review of the entire record now before the Court leads the Court to find that rendering the previously intended decision would be "clearly wrong;" the correct interpretation requires a set-aside of only 130 acres. *See Gannett Co. Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

121. NCCo Mot. at 15.

122. PCRS Mot. at 31.

123. *Stecher v. Tate,* 1993 WL 287618, at *3 (Del. Ch. July 28, 1993); *Seabreak Homeowners Ass'n, Inv. v. Gresser,* 517 A.2d 263, 269 (Del.Ch.1986).

"specific use" of 130 acres is the "development of an 18–hole golf course."[124]

So the two Agreements provide plainly that the "130 acres set aside for an 18–hole golf course", or more precisely "the development of an 18–hole golf course", was included among the "areas set aside *for specific land uses*."[125] Moreover the language used demonstrates the explicit original intent that the 130 acres would be dedicated to the specific single purpose of development of a golf course, and would not serve double-duty to meet some other "open space" requirement.[126] Accordingly, unless validly changed or amended, the restriction limits the 130–acre set aside to a single specific use.

While the County argues that the Master Plan requires that the Golf Course, having been constructed, must remain in its constructed configuration and must remain in operation, no language from either the 1964 Agreement or the 1969 Amendatory Agreement supports such an assertion. The only requirement established by the Master Plan with respect to a golf course is that land be set aside for the development of such. Actual operation is not required by the Master Plan.[127] Because PCRS admitted knowledge of the restrictive covenants contained in the Master Plan—although it claimed not to have interpreted them as such—the Court need not make further inquiry into notice.[128]

124. 1969 Amendatory Agreement at art. 7 (amending Article 10 of the 1964 Agreement) ("The updated tentative comprehensive master plan of Pike Creek Valley shows a minimum area of approximately 130 acres set aside for the development of an 18–hole golf course. This constitutes a set-aside for a specific use of 130 of the 215.00 acres set aside for open spaces."). This ruling differs from the previous Judge's intended ruling as expressed at oral argument in November 2011. Since that time, however, the parties have significantly supplemented the record to include, among other things, those materials the previous Judge requested following oral argument. Upon review of the entire supplemented record, and in consideration of the maxim that restrictive covenants should be strictly construed and narrowly read, *Regency Group, Inc. v. New Castle County*, 1987 WL 1461610, at * 1 (Del. Ch. Dec. 3, 1987), the Court now holds that this is one of those rare circumstances where justice requires reconsideration of its earlier findings. *See May v. Bigmar, Inc.* 838 A.2d 285, n. 8 (Del.Ch.2003). While the 1964 Agreement and 1969 Amendatory Agreement envisioned the restriction might need to be greater than 130 acres to truly "develop" a golf course, no written, recorded, or distributed plan contains an express provision requiring a golf course set-aside greater than 130 acres. *See* PCRS Supp. Letter of Nov. 23, 2011 (D.I. 68) (and accompanying exhibits).

125. *Id.* at art. 3 (emphasis added) (amending Article 7 of the 1964 Agreement which provided that the "DEVELOPER, its successors and assigns, will *set aside and hold throughout the course of development* of the entire SUBJECT ACREAGE *the following land uses* irrespective of the ultimate zoning of the SUBJECT ACREAGE: …Open Spaces …) (emphasis added).

126. *See, e.g., id.* (setting forth the overall open space set-asides and identifying the different uses thereof as that "set aside for an 18–hole golf course" and that "which shall be non-golf open space").

127. In fact, the Master Plan anticipates that a golf course might never have been built and that land might become non-profit recreational space. 1964 Agreement at art. 10; 1969 Amendatory Agreement at art. 7 (amending Article 10 of the 1964 Agreement).

128. Oral Arg. Tr., Nov. 16, 2011, at 60–61 ("PCRS Counsel: I'll just say, frankly, it was an unrecorded document and I was also aware of the entire context of this. Did I think that that was a restrictive covenant? Absolutely not."). *See also* Recommendation Deed Restriction Change, May 20, 2008 (despite a subdivision plan "which separated the dinner theater and associated parking on a 5.3–acre parcel from the larger 168.7–acre parcel containing the golf course," "[t]he proposed deed restrictions will have no effect on

Thus the County, as a third-party beneficiary of the 1964 and 1969 Agreements, may insist that 130 acres must remain set aside for development as a golf course.[129]

As such, the Court cannot say that the restrictive covenant, itself, prevents PCRS from constructing the proposed Hogan and Terraces developments. At the same time, the Court cannot speak to the other procedural disqualifications that may prevent the projects from moving forward. The restrictive covenant does, however, require PCRS to demonstrate how their planned development projects would conform to the Master Plan, and does require PCRS to set aside a minimum of 130 acres of land which may feasibly be developed as an 18–hole golf course.[130]

The Agreements require PCRS to set aside and dedicate 130 acres minimum, but the Agreements do not mandate that the

Golf Course operate as a going concern.[131] PCRS is correct that courts generally disfavor equitable enforcement of affirmative, rather than restrictive covenants.[132] Practically, a restriction on land is less burdensome than a covenant that requires action on behalf of the owner. In 1969, when the covenanters set aside land to be dedicated as open space and likely used to develop a golf course, they did not, in the same Agreement, execute an affirmative covenant that would require the owner of that land to operate a golf course in perpetuity. In the years since Pike Creek Valley was first developed, operating the Golf Course became economically unfeasible. And while changed economic circumstances will not normally suffice as a basis for removing restrictions, here it is possible that even if an affirmative covenant was found to exist, removal of that covenant might be justified due to changed circumstances.[133]

the 168.7–acre parcel containing the golf course, and ... the original deed restriction for the Pike Creek Golf Course ... still apply to [that] parcel"). [A177–78].

129. The Court notes that the set-aside could be greater if more than 130 acres are required to construct an 18–hole golf course as envisioned in the Master Plan. The issue of whether any particular parcel sufficiently complies with the enumerated restriction remains, however, beyond the scope of this opinion. But beyond doubt, the restriction, unless it is changed, has three lineamental features, the land parcel set aside must: (1) be no less than 130 acres; (2) have physical attributes—i.e., be of sufficient quantity, quality, contiguity and configuration—to accommodate development of an 18–hole golf course; and (3) be set-aside, as it was originally dedicated, for the specific single use of development (or now re-development) of a golf course.

130. As set forth in Part V.B.3., *infra*, the record supports a finding that the Hogan Drive Plan, due to its size and configuration, would not violate the restriction found here. *See* Hogan Drive Townhouse Addition Plan, Feb.

11, 1982. [A176]. The same cannot be said, at this stage, for the Terraces Plan, which is far larger. *See* Terraces at Pike Creek Exploratory Sketch Plan Cover Sheet. [A392].

131. *See Regency Group, Inc. v. New Castle County*, 1987 WL 1461610, at * 1 (Del. Ch. Dec. 3, 1987) ("[C]ovenants restricting the free use of property must be strictly construed.").

132. *Eagle Enterprises, Inc. v. Gross*, 39 N.Y.2d 505, 384 N.Y.S.2d 717, 349 N.E.2d 816, 820 (1976) ("The affirmative covenant is disfavored in the law because of the fear that this type of obligation imposes an 'undue restriction on alienation or an onerous burden in perpetuity.'" (quoting *Nicholson v. 300 Broadway Realty Corp.*, 7 N.Y.2d 240, 196 N.Y.S.2d 945, 164 N.E.2d 832, 835 (1959))).

133. *See, e.g., El Di, Inc. v. Town of Bethany Beach*, 477 A.2d 1066, 1069 (1984) ("A court will not enforce a restrictive covenant where a fundamental change has occurred in the intended character of the neighborhood that renders the benefits of the underlying imposition of the restrictions incapable of enjoyment.")

PCRS claims that summary judgment is inappropriate at this juncture because "intent is a question of fact that, if disputed, cannot be resolved by inference against the non-moving party."[134] While it is true that the Court must view all evidence and draw all inferences in favor of the non-moving party, where the record supports the moving party's assertion that there are no material issues of fact remaining, the burden then shifts to the non-moving party to demonstrate which issues of material fact remain.[135]

The record supports the County's motion for summary judgment, so PCRS may not "rest upon [ ] mere allegations or denials of the [County]'s pleadings," but must demonstrate to the Court where there are genuine issues of material fact.[136] PCRS has failed to establish that a true question of fact exists, and notwithstanding voluminous submissions, PCRS has not disclosed what additional evidence it would develop, beyond the current record, to demonstrate the original owners' intent was something other than that which is clearly stated in the Agreements comprising the Master Plan. Instead, PCRS makes the bald assertion that there exists an issue of material fact, without indicating what evidence, if any, would support such a claim.

The restriction requires a 130–acre set-aside. In order to meet this restriction PCRS must, of the land at issue here, leave set aside no less than 130 acres for the specific use of development of an 18–hole golf course; for that restriction to not be "illusory or meaningless,"[137] it must be a parcel of land of sufficient quantity, quality, contiguity and configuration to meet that specific purpose.[138] And if it cannot, or should PCRS want to develop another use within the 130–acre set-aside, PCRS must avail itself of the Restriction Change process.[139]

**2. By collecting taxes on the Hogan Drive lots as if subject to development, the County waived its right to object to PCRS' proposed Hogan Drive Plan.**

The restriction on PCRS' use and development of the subject land is limited to the set-aside of 130 acres for the specific use of development of an 18–hole golf course. But PCRS' landholding exceeds 130 acres. The proposed Hogan Drive development would not cause the acreage set aside for such specific use to fall below the minimum. The fact that the County now wants the acreage set aside to include the Hogan Drive parcels cannot control here. PCRS argues that the County's fail-

---

134. PCRS' Corrected Proposed Findings of Fact and Conclusions of Law, dated June 14, 2013, at 19. *See Merrill v. Crothall–Am., Inc.,* 606 A.2d 96, 99–100 (Del.1992); *Shahan v. Shahan,* 2012 WL 6114972, at *1 (Del. Ch. Dec. 10, 2012); *Bird's Constr. v. Milton Equestrian Ctr.,* 2001 WL 1528956, at *2 (Del. Ch. Nov. 16, 2001).

135. Ct. Ch. R. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial."); *Moore v. Sizemore,* 405 A.2d

679, 681 (Del.1979) ("When a motion for summary judgment is 'supported' by such a showing under the Rule, the burden shifts to a non-moving party to demonstrate that there are material issues of fact." (citing *Hurtt v. Goleburn,* 330 A.2d 134, 135 (Del.1974))).

136. Ct. Ch. R. 56(e).

137. *Stecher v. Tate,* 1993 WL 287618, at * 4 (Del. Ch. July 28, 1993); *In re Blue Rock Manor Civic Ass'n v. Hartline,* 1992 WL 251381, at * 3 (Del. Ch. Sept. 29, 1992).

138. *See* n. 130, *supra.*

139. *See* Part V.C., *infra.*

ure to take any action to dispute the *G.R.G. Realty* decision, subsequent taxation of the Hogan lots, and persistent zoning of the Hogan lots as residential, together serve as a waiver of its third-party beneficiary rights to enforce any land use restriction or covenant which would prevent construction of the Hogan Drive development. The Court agrees.

While the County contends any waiver must be a "voluntary and intentional relinquishment of a known right," it also does not dispute that the Hogan Drive lots have been taxed for approximately thirty years based on their value as buildable townhouse sites and retained their residential zoning classification as part of a 1998 rezoning of the entire County. Moreover, the County took no action to challenge the 1982 recorded subdivision plan for the Hogan Drive Townhouse Addition.[140] While the County's inaction was likely premised on G.R.G.'s sale of the Golf Course and the new owner's abandonment of the Hogan Drive development plan, that inaction, when taken in conjunction with the County's taxation and zoning decisions, amounts to a voluntary and intentional relinquishment of the County's right to insist that the Hogan Drive lots remain as open space to meet the requirements of the covenant running with PCRS' land.

Equitable principles do not permit the County to reap the benefit of thirty years of tax income from Hogan Drive's develo-

pable or buildable parcels, only to now argue those same parcels must be retained as open space. The approximately 1.4 acres of proposed development may be accomplished without contravening the golf course restriction created by the Master Plan.[141] Thus the PCRS application to develop the Hogan Drive lots does not divest the County of a right that it has not waived, nor does it violate the restrictive covenant requiring 130 acres of open space set aside for development of a golf course. Absent a finding of technical or regulatory noncompliance, the Hogan Drive development must be allowed to proceed.

**3. The Court will not defer to the County's interpretation of the scope of the restrictive covenant created by the Master Plan.**

The County argues that the Court should not substitute its judgment for that of the County Council, as expressed in Resolution 10–217, adopted December 2010. Resolution 10–217 reads, "WHEREAS, under applicable covenants, agreements,. dedications, and plans enforceable by the County, the current owners plan to build in violation [of] the requirement that an 18–hole golf course continue on the property in its current form and also violates the concepts of the applicable [M]aster [P]lan."[142] While the Court will generally defer to the County's interpretation of its own code,[143] the Court

---

140. *See* Hogan Drive Townhouse Addition Plan, Feb. 11, 1982. [A176]. The 1982 recorded subdivision plan was the same plan which was the subject of controversy in *G.R.G. Realty*. It contains the notation indicating the plan has been reviewed as to "content and compliance" with County regulations. *Id.* It simply wasn't reviewed "as to compliance with the 1964 Agreement or the 1969 Amendatory Agreement of record pertaining to development of the Pike Creek Valley community." *Id.*

141. In fact, it appears there would not even be major disruption of the Golf Course as

most recently configured. *See; e.g., id.* (demonstrating ability to move thirteenth green in order to accommodate Hogan Drive development). [A176].

142. Resolution No. 10–217, Dec. 14, 2010. [A311].

143. *See J.N.K., LLC v. Kent County Levy Court,* 974 A.2d 197, 209 (Del.Ch.2009); *Green v. Sussex County,* 668 A.2d 770, 775 (Del.Super.Ct.1995).

is the proper body to decide the extent of restrictive covenants created by the Master Plan, especially where two parties stand in opposition.[144]

The several Delaware decisions dealing with the Master Plan demonstrate that when the scope of a restriction flowing therefrom is questioned, the determination is a judicial function.[145] Thus to the extent that Resolution 10–217 attempts to define the restriction, it cannot.

### 4. The doctrine of merger by deed does not serve to extinguish the golf course restriction.

■■■■■ Despite the restrictive covenants described in the Master Plan, subsequent deeds of sale for the subject Golf Course did not explicitly incorporate those restrictions. PCRS argues the doctrine of merger, therefore, necessarily extinguishes any restriction on the Golf Course this

Court may find, because, "as a general rule, after a property has been conveyed to a purchaser, the rights of the parties are to be determined by covenants of the deed."[146] PCRS' reliance on the doctrine of merger, however, is flawed.

■■■■■ Under the doctrine of merger, any "agreement[s] [ are] said to merge with the deed and become void."[147] It was "developed to resolve issues raised where a seller of real property undertook certain obligations in a contract of sale and then delivered something less than he promised...."[148] The doctrine, however, is subject to certain exceptions, namely that the intent of the parties is controlling.[149] Generally, collateral matters do not merge into the deed,[150] and, under Delaware law, the merger doctrine has been "largely limited" to the non-collateral questions of "title, quantity, and land use."[151]

**144.** *G.R.G. Realty Co. v. New Castle County,* 1981 WL 697909, at * 3 (Del.Super. Ct. Dec. 30, 1981) ("If a controversy arises out of a master plan and rights which may have been created by it, that controversy is 'beyond the scope of the Board's review power.'" (quoting *New Castle County v. Richeson,* 347 A.2d 135, 137 (Del.1975))).

**145.** *Id.* at * 3–4 (Then–Judge, later Chief Justice Christie observed, "the legal issues as to the interpretation of the [Agreements] as to the rights of the third-party beneficiary and as to other legal issues would be ... for eventual determination by a Court.... The legal issues are more properly determined in a judicial setting after both sides have been heard by an impartial judge.... [T]hose issues may be brought before a court once the plans are approved or disapproved on their merits."); *see* Part III, *supra; see also Richeson,* 347 A.2d at 137 ("As the controversy in this case clearly arose out of interpretation and enforcement of the master plan ... we hold that the dispute over conformity with the master plan was beyond the scope of the Board's review.").

**146.** *George v. Kuschwa,* 1986 WL 6588, at * 4 (Del.Super.Ct. May 21, 1986); *see* DEL. CODE

ANN. tit. 25, § 121(b) ("A deed ... unless otherwise restricted or limited, or unless contrary intention appears therein, shall be construed to pass and convey to the grantee therein and to his heirs and assigns the fee simple title....").

**147.** *Pryor v. Aviola,* 301 A.2d 306, 308 (Del.Super.Ct.1973).

**148.** *Reed v. Hassell,* 340 A.2d 157, 160 (Del.Super.Ct.1975) (explaining the doctrine of merger "can often be explained as a way of regarding the delivery of the deed as a sort of accord and satisfaction").

**149.** *Id.*

**150.** *Allied Builders, Inc. v. Heffron,* 397 A.2d 550, 553 (Del.1979); *George,* 1986 WL 6588, at *4; *see Drees Co. v. Osburg,* 144 S.W.3d 831, 833 (Ky.Ct.App.2003) ("the merger doctrine does not apply to collateral agreements.").

**151.** *George,* 1986 WL 6588, at *4. At least one other jurisdiction has found "executor agreements for the performance of separate and distinct obligations beyond the conveyance it-

PCRS mistakenly relies on the doctrine of merger to extinguish clear restrictions in the Master Plan. It attempts to extinguish the restriction found in the 1964 and 1969 Agreements by arguing that no restriction not contained in the deed of sale is enforceable against PCRS. The doctrine of merger, however, serves only to extinguish contracts for sale, not contracts memorializing voluntary land restrictions executed by the original owners—with a clear and express intent that those restrictions be imposed on their "successors, transferees and assigns" [152]—and benefitting the County.

To apply the merger doctrine in the instant case would be to summarily divest the County of its third-party beneficiary status as granted in the Master Plan and multiple subsequent recorded plans for the Golf Course, which contain language incorporating the Master Plan.[153] Simply invoking the doctrine without acknowledging the County's right of enforcement would be counter to the plain language of the Master Plan, and the intent of the parties, which is controlling.[154] Restrictions on

land development cannot be said to merge with the deeds here, where the primary purpose of the Master Plan was to bind the original owners, their successors and assigns, and therefore convince the County to approve the original owners' planned mixed-use community. The legal force and origin of the restrictive covenants that bind the subject acreage here is contractual in nature and has been so construed.[155] And again, restrictive covenants, the existence of which a purchaser has "notice, either actual or constructive," not merely by deed provision, may be enforced.[156] PCRS had such knowledge.[157]

Because the Master Plan creates an enforceable limited restriction regarding the land on which the Golf Course was situated, because subsequent recorded plans demonstrate subsequent owners' intention to dedicate "Private Open Space" in accordance with the Master Plan and for the benefit of the County, and because it had knowledge of the restriction, PCRS cannot seek refuge in the doctrine of merger to extinguish the 130–acre restriction created by the Master Plan.

---

self do not merge with a deed at closing," nor do "obligations that are not to be performed until after delivery of a deed." *Premier Title Co. v. Donahue,* 328 Ill.App.3d 161, 262 Ill. Dec. 376, 765 N.E.2d 513, 518 (2002).

**152.** 1964 Agreement at art. 3.

**153.** *See, e.g.,* Microfilm 2456, Nov. 1973 (A 74); Microfilm 4737, Jan. 1978 (A 75); Microfilm 5514, Mar. 1980(A76); PCRS Supp. Letter, Nov. 23, 2011 (D.I. 68) (and accompanying exhibits) (" 'Private Open Space' is established in accordance with the agreement as amended [Master Plan] designating the New Castle Co. Government as third-party beneficiary.").

**154.** *Reed,* 340 A.2d at 160.

**155.** *Seabreak Homeowners Ass'n, Inv. v. Gresser,* 517 A.2d 263, 269 (Del.Ch.1986).

**156.** *Mendenhall Village Single Homes Ass'n v. Harrington,* 1993 WL 257377, at * 2 (Del. Ch.

June 16, 1993); *Alliegro v. Home Owners of Edgewood Hills, Inc.,* 122 A.2d 910, 912 (Del. Ch.1956) (buyers with knowledge cannot effectively object).

**157.** Oral Arg. Tr., Nov. 16, 2011, at 60–61. PCRS cannot simply claim that the 1969 Amendatory Agreement, because it was not recorded, carries no weight. *Cashvan v. Darling,* 107 A.2d 896, 901 (Del.Ch.1954) ("An additional and independent reason why plaintiff can get no aid from the fact that the plan ... is unrecorded arises from the fact that the deeds ... explicitly refers to the engineers' plan. Under the law plaintiff was required to take notice of all recorded deeds ... conveying portions of this tract.... An examination of such deeds would have revealed the restrictions binding on the tract.... Although unrecorded [the restriction] was readily available.").

**5. The Motion to Intervene is denied because, in part, no implied servitude functions to enlarge the original set-aside beyond 130 acres.**

██ The County's position is that an implied servitude requires 177 acres, the size of the Golf Course immediately prior to its closure, rather than the 130 acres explicitly reserved in the Master Plan, be set aside. PCRS argues against the existence of the implied servitude and the County's standing to raise such a claim. The County's claim is predicated upon the affidavits of several Pike Creek Valley residents who claim to have purchased property and/or paid lot premiums in reliance upon both oral representations of developers and upon the Distributed Master Plan, which showed the Golf Course abutting certain residential properties.[158]

These residents, reacting to PCRS' claim that the County lacks standing, filed a Motion to Intervene in the instant action on November 14, 2011, two days prior to the scheduled oral argument on the real parties' cross-motions for summary judgment.[159] The Interested Parties state their only purpose in intervening is to provide affidavits to support and supplement the County's claim that an implied servitude requires the Golf Course to continue as a 177-acre entity.[160]

If the Court were to dismiss the County's implied servitude claim on standing alone, the Interested Parties wish to assert the claim so it may be decided upon the merits. PCRS opposes the Interested Parties' motion, and further contends that the Court should only consider the motion if it considers PCRS' pending Motion for Defendant Class Certification.[161] Should the Court grant the class certification, PCRS argues, the Interested Parties

---

**158.** *See* Mot. to Intervene, Nov. 14, 2011 (D.I. 67), at ¶ 14.

**159.** The Interested Parties claim they do have standing as original owners of residential properties abutting the Golf Course. *Id.* at ¶ 14. The Court heard oral argument on the cross-motions for summary judgment as scheduled with PCRS' Mot. for Class Certification and the Interested Parties' Mot. to Intervene pending. *See generally* Oral Arg. Tr., Nov. 16, 2011.

**160.** Tr. of Off. Conf., Apr. 4, 2013, at 12 (Interested Parties' Counsel: "So the purpose of our intervening was primarily to say we agree, support, and wanted to supplement the County's case. That's it. If we're required to file anything beyond that to get something into the record ... we'll do that. But if these documents that we've attached to the motion to intervene are sufficient, we're pretty must going to echo the County's position and don't need to file anything further."). Each of the Interested Parties own property abutting the land in question. Specifically, Karen J. Gamm claims she purchased a lot at a $5,000 premium in the Village of Plum Run, located between the 4th green and the 5th tee of the Golf Course, only after her concerns "about developers someday being able to build on the Golf Course," were assuaged by verbal assurances from the builder and the presentation of three separate maps, including the Distributed Master Plan. Ex. 1 to Mot. to Intervene (D.I. 67), at 1–2. John L. Tetromono asserts he paid a $2,000 "premium lot" charge for the property he purchased in the Linden Heath subdivision from Luigi Fortunato, Inc., because it was adjacent to the 12th green of the Golf Course. Ex. 2 to Mot. to Intervene (D.I. 67), at 1–2. Finally, Leo. J. McDermott here submits an affidavit he executed in 1983 in which he stated the Golf Course was nearly complete when he purchased his home on a lot directly adjacent to the 10th hole. Ex. 3 to Mot. to Intervene (D.I. 67), at 1. Mr. McDermott says he paid the builder a $500 premium for the Golf Course-adjacent lot. *Id.* at 2.

**161.** Tr. of Off. Conf., Apr. 4, 2013, at 13–14. *See also* Ct. Ch. R. 23. This Court has stayed the PCRS Mot. for Class Certification. Tr. of Scheduling Conference, July 29, 2011, at p. 18–19; *New Castle County v. Pike Creek Recreational Services, LLC*, Del.Super., C.A. 5969, Wallace, J. (Sept. 5, 2013) (ORDER) (D.I. 102) (implementing the Court's July 29, 2011 rulings with modifications).

would qualify as members of the proposed defendant class comprising 20,812 residents and 100+ area organizations.[162]

No intervention will be permitted, because the application to intervene was untimely and the claim the Interested Parties wish to "echo" is futile. Pursuant to Chancery Court Rule 24, a party will be permitted to intervene as a matter of right either where there is an unconditional statutory right to do so, or where "disposition of the action" would "impair or impede [an] applicant's ability to protect" his or her interest "relating to the property ... which is the subject of the action."[163] Even so, a party will not be permitted to intervene where its interests are adequately represented by an existing party to the action.[164]

Should a party fail to meet the test for intervention of right, the Court may still permit intervention where the claim of the would-be intervener shares common questions of law or fact with the action.[165] The Court, however, must take into consideration whether allowing intervention would "unduly delay or prejudice the adjudication of the rights of the original parties."[166]

The Interested Parties suggest that the Court should allow them to intervene in the instant action because this Court's disposition of the "issue,"—namely whether the implied servitude which the County, as one of its many arguments, claims to exist

and operate as a ban to PCRS' development—may "impair or impede the [Interested Parties'] ability to protect their interests to preserve the Golf Course, which abuts their residential properties and directly enhances their property values and qualit[ies] of life."[167] PCRS counters that the Interested Parties' motion is untimely without excuse for delay. The County supports the Interested Parties' implied servitude claim on the grounds that the claim is identical to that raised by the County. No party directly claims that the County has (or will) inadequately represent the Interested Parties' interests with respect to the implied servitude claim.

The Interested Parties have failed to demonstrate that the disposition of the issue will "impair or impede" their alleged right to pursue a claim based on the theory of implied servitude. In their supporting Motion to Intervene brief, the Interested Parties predict that PCRS intends to assert the County lacks standing to block PCRS' development plan based on the creation of an implied servitude, or common scheme of development, that was established between the original owners and homebuyers at the time the Golf Course and the land surrounding it was first developed.[168] In actuality, however, the Interested Parties have failed to demonstrate that this right to pursue such a claim is affected by this Court's determination of the County's claim.

---

162. PCRS Mot. for Class Certification, July 22, 2011 (D.I. 44), at 11.

163. Ct. Ch. R. 24(a)(2).

164. *Id.; see In re MAXXAM, Inc./Federated Dev. S'holders Litig.,* 698 A.2d 949, 955 (Del. Ch.1996).

165. Ct. Ch. R. 24(b)(2).

166. *Id.; see Wier v. Howard Hughes Medical Institute,* 404 A.2d 140, 145 (Del.Ch.1979).

167. Mot. to Intervene (D.I. 67), at ¶ 2. *See also* Ct. Ch. R. 24(a)(2). The Interested Parties make no claim that Rule 24(a)(1) is applicable in this case, and the Court finds there is no Delaware statute which "confers an unconditional right to intervene" upon the Interested Parties. *See* Ct. Ch. R. 24(a)(1).

168. Mot. to Intervene (D.I. 67), at ¶ 2.

Were the County's claim dismissed for lack of standing, the Interested Parties would retain their own potential implied servitude claim wholly unaffected by a prior dismissal of the County's claim for a lack of standing. Moreover, should the Court find the County does indeed have standing to assert an implied servitude claim, Counsel for the Interested Parties has indicated that the County would adequately represent their rights.[169] Therefore, there is inadequate support in the record that the Interested Parties are entitled to intervene as a matter of right.[170] And given the Court's simultaneous decision on summary judgment, the Interested Parties' claim is likely moot.

■ Even where intervention of right is not appropriate, the Court in its discretion may permit a party to intervene where the party's "claim or defense and the main action have a question of law or fact in common."[171] "[W]here an original plaintiff pleads a cognizable claim of wrongdoing, but is prevented from pursuing the claim because of a technical standing issue, a motion to intervene by a party who stands in a position to press the claim should be viewed favorably by a court of equity."[172] In determining whether intervention is appropriate, however, the Court "shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."[173] Here, given the futility of the claim itself, that is a true concern.

Assuming *arguendo* that the County does have standing to pursue the implied servitude claim, the County's claim and the Interested Parties' claim would each be premised upon the common question of whether an implied servitude prevents PCRS from developing the Golf Course. That leaves the Court to decide only whether allowing the Interested Parties to intervene would cause undue delay or otherwise prejudice PCRS.[174]

At the time the Interested Parties filed their Motion to Intervene, the existing parties had fully briefed the cross-motions for summary judgment, and argument was imminent.[175] A year prior to the Interest-

---

169. Tr. of Off. Conf., Apr. 4, 2013, at 11–13 (Interested Parties' Counsel: "So the purpose of our intervening was primarily to say we agree, support, and wanted to supplement the County's case. That's it.... [W]e're pretty much going to echo the County's position....").

170. *See* Ct. Ch. R. 24(a)(2).

171. Ct. Ch. R. 24(b)(2). The Interested Parties make no claim that Rule 24(b)(1) is applicable in this case, and the Court finds there is no Delaware statute which "confers a conditional right to intervene" upon the Interested Parties. *See* Ct. Ch. R. 24(b)(1).

172. *Flynn v. Bachow*, 1998 WL 671273 at *4 (Del. Ch. Sept. 18, 1998). Compare *Flynn* ("Where the original plaintiff has been disqualified from pursuing the claim, the necessity for the intervenor to step in becomes more apparent") and *In re MAXXAM, Inc./Federated Dev. S'holders Litig.*, 698 A.2d 949, 955 (Del Ch.1996) ("It is undisputed that

no existing party has standing to prosecute the claims.... Moreover, absent [the Intervenor's] intervention, those claims would have to be dismissed. In such circumstances intervention is appropriate ....") with the current case, in which the Interested Parties seek to intervene on an ancillary claim.

173. Ct. Ch. R. 24(b)(2).

174. The County does not oppose the Interested Parties' Mot. to Intervene. *See* NCCo Resp. to PCRS' Brf. in Opposition to the Mot. to Intervene, Apr. 23, 2013 (D.I. 83), at 3.

175. *See CAPM Corp. v. Protegrity, Inc.*, 2001 WL 1360122, at *11–12 (Del. Ch. Oct. 30, 2001) ("[C]ourts generally have been reluctant to allow intervention when the applicant appears to have been aware of the litigation but has delayed unduly seeking to intervene.... The most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for

ed Parties' motion, information regarding PCRS' planned development of the Golf Course was widely, publicly available.[176] To that end, the Interested Parties fail to satisfactorily explain their delayed response to this ongoing litigation.[177]

While PCRS is indeed engaged in the process of defending the implied servitude claim raised by the County, the additional discovery and preparation required to effectively defend the Interested Parties' claim would clearly prejudice PCRS and unduly extend what has already been a prolonged process.[178]

Allowing the Interested Parties' intervention is neither required nor advisable. Thus, the Court, assumes without deciding that the County has standing to assert the implied servitude claim, and, even considering the additional facts supplied by the Interested Parties' affidavits, finds the claim without merit.

 Under Delaware law, a servitude may be established in one of two ways: (1) "by explicit written language of the intent of the grantor and the grantee to create a restrictive covenant in the deed . . . or another recorded document;" or (2) "by implication as is usually ascertained from a common plan of development."[179] Under the first method, a plaintiff must show the restriction touches and concerns the land, the original covenanting parties intended to establish the restriction, and that the purchasing party was on actual or constructive notice of the restriction.[180] The second method, an implied servitude, operates to substitute a common development scheme for constructive notice, as is required by the test.[181] Essentially,

> [W]here an owner of a tract of land lays it out in building lots, makes a plot showing a general building scheme, and sells to various purchasers in accordance therewith, inserting the same or similar covenants in all the deeds, it seems that an intent to benefit all the land in the tract and to induce purchases thereby may be inferred.[182]

 Implied servitudes are disfavored by the Court, but necessarily negotiate the "tension between protecting neighboring property owners' expectations for their community and the rights of landowners to use their property as they may lawfully choose."[183] "[W]hether there has been an implicit imposition of a restrictive covenant is an issue of fact."[184] The County, as the

---

intervention will prejudice the existing parties to the case.").

**176.** *See, e.g.,* various news articles and press releases discussing PCRS' attempt to develop the Golf Course and NCCo's opposition to the same. Ex. 7–21 to Aff. of A. Kimberly Hoffman, Apr. 16, 2013.

**177.** *See* Tr. of Off. Conf., at 11 (Interested Parties' Counsel: "Your Honor, I was under the mistaken belief that there was a hearing or an argument scheduled for late November. That's why I filed [the Motion to Intervene] November 14.").

**178.** *See CAPM Corp.,* 2001 WL 136122, at * 12.

**179.** *Leon N. Weiner & Assocs., Inc. v. Krapf,* 623 A.2d 1085, 1088 (Del.1993).

**180.** *Van Amberg v. Board of Governors of Sea Strand Ass'n,* 1988 WL 36127, at *6 (Del.Ch. Apr. 13, 1988).

**181.** *Greylag 4 Maintenance Corp. v. Lynch–James,* 2004 WL 2694905, at *5 (Del. Ch. Oct. 6, 2004).

**182.** *Id.*

**183.** *Id.* at * 5–6.

**184.** *Leon N. Weiner & Assocs.,* 623 A.2d at 1089; *see Greylag,* 2004 WL 2694905, at * 5 (denying summary judgment based on the incomplete record from which intent of the parties could not be determined). The Court is confident it may rely upon the extensive record created over the course of nearly three

proponent of a restrictive covenant preventing development on any of the 177 acres on which the Golf Course was situated, "has the burden of establishing the equitable restrictions that they seek to have imposed." [185] Thus, in order to enforce the 177–acre restriction it suggests, the County must demonstrate, by clear and convincing evidence, that it has a "right to benefit from an implicit imposition" on the Golf Course, now owned by PCRS.[186]

The County would argue (as the Interested Parties would argue) that if the 1964 Agreement and 1969 Amendatory Agreement alone created only an actual restriction over 130 acres of the Golf Course, then the theory of implied servitude supports expanding that express restriction to the entire 177 acres on which the Golf Course was last situated. Working through the three-part test relied upon by Delaware Courts, neither party would disagree that an alleged expanded golf course restriction would touch and concern the land. The remaining issues therefore, are whether the covenanting parties intended a more expansive restriction and whether the taking party, PCRS, had actual or constructive notice that the restriction was greater than what had been memorialized in the Master Plan. As far as the Court can ascertain, the County argues a common plan of development provides both evidence of the parties' intent to restrict a land area greater than the 130 acres explicitly described in the 1969 Amendatory Agreement, and constructive notice to PCRS that an expanded restriction exists.

There are several problems with the County's claim that an implied servitude, derived from a common plan of development, requires PCRS to set aside a plot of land for the Golf Course more than 25 percent larger than that which is explicitly required by the Master Plan; it is necessary to address two of those issues here. First the common plan or scheme of development is not applicable to the case at bar. The equitable doctrine operates to enforce the express scope of a written restriction which has been unintentionally omitted from one of several similarly-situated deeds.[187] The doctrine simply does not operate, as the County suggests, to expand the geographic scope of an express restriction where no writing exists to evidence such intent.[188] Thus the County's attempt to expand the scope of the explicit 130–acre restriction through a "common plan of development" theory fails. The theory does not operate under these factual circumstances.

Second, even if a common plan or scheme theory was applicable here, the

years of litigation in determining this question of fact.

**185.** *Van Amberg,* 1988 WL 36127, at * 4; *see also Leon N. Weiner & Assocs.,* 623 A.2d at 1088.

**186.** *Leon N. Weiner & Assocs.,* 623 A.2d at 1092.

**187.** *See, e.g., Leon N. Weiner & Assocs.,* 623 A.2d at 1092 ("The issue presented ... was whether certain uniform deed restrictions, individually imposed by a common grantor over time upon each of the Numbered Lots of a residential housing development, apply by im-

plication to the adjacent unsubdivided Quarry Parcel, notwithstanding the common grantor's failure specifically to include such seed restrictions when the Quarry Parcel was conveyed."); *Tubbs v. Green,* 55 A.2d 445, 447 (Del.Ch.1947) (plaintiffs' sued defendant neighbors to enforce so-called "Jensen restrictions," which plaintiffs' deed contained, but defendants' deed did not).

**188.** *Van Amberg,* 1988 WL 36127, at *4 ("The equitable restrictions that plaintiffs seek to have declared and enforced require a writing 'signed by the party to be charged therewith.' " (quoting Del. Code Ann. tit. 6, § 2714(a))).

County has not demonstrated the 1964 Agreement and the 1969 Amendatory Agreement created a common scheme of development that would serve as a basis for expanding the golf course restriction to 177 acres.[189] The essence of an implied servitude based on a common scheme is the shared benefit and burden that reciprocal servitudes provide to similarly-situated residents.[190] But just because land parcels lie adjacent to one another, does not perforce mean they are within the same common scheme of development. Implied servitudes are not created simply because lots or parcels are included in the same plan, but by a finding that there was intent to similarly bind the lots and parcels such that each benefited from the shared burden.[191] In order for an implied servitude to bind the Golf Course, "it must arise by implication from the restrictions imposed in the deeds," to the subdivided lots.[192]

By the sheer fact that the several subdivided communities surrounding the Golf Course exclusively allow residential construction, those properties, some of which are held by the Interested Parties, do not contain reciprocal servitudes with the Golf Course. The Golf Course is a separate land entity not included in the Interested Parties' respective subdivisions.[193] Nor can it be said that a lack of reciprocal easements is the result of some mistake of recording; the plats were clearly designed for distinct and separate purposes. The Interested Parties mere claim that they believed the Golf Course would continue in perpetuity to benefit their residential property is not a basis for an implied easement.[194]

Moreover, the Distributed Master Plan, or other subsequently recorded plats did not amend the express 130-acre restriction.[195] Although various plats have been prepared, distributed, and recorded over the years, there is no evidence of an intent, either explicit or implied, to enlarge the

189. See, Bave v. Guenveur, 125 A.2d 256, 258 (Del.Ch.1956) (the developer "was free to develop the various portions of the area . . . as it saw fit, subject of course to whatever restrictions it desired to impose"); Gammons v. Kennett Park Dev., 61 A.2d 391, 394 (Del.Ch. 1948) ("There is no legal reason why a developer cannot develop successive portions of his lands independently of one another, imposing different restrictions (or none at all) upon each, provided the deeds clearly evidence the explicit intent to limit the burden and the benefit to the designated area of definitely show an intent not to impose similar restrictions upon all."); See, e.g., 1964 Agreement at art. 7 (setting aside land for specific used included schools and churches, commercial, and open space); 1969 Amendatory Agreement at art. 3 (same).

190. Leon N. Weiner & Assocs., Inc. v. Krapf, 623 A.2d 1085, 1092 (Del.1993); Greylag 4 Maintenance Corp. v. Lynch–James, 2004 WL 2694905, at *6 (Del. Ch. Oct. 6, 2004).

191. See Bave, 125 A.2d at 259 ("[A] developer is free to develop an area section by section

and by the use of appropriate language to subject it to whatever restrictions he may desire. . . .").

192. Leon N. Weiner & Assocs., 623 A.2d at 1089.

193. See Bave, 125 A.2d at 259 ("Nor is there any merit in the point that the plaintiff . . . was shown a plot plan . . . because, as heretofore indicated, [the Court] cannot agree that a reasonable person viewing the recorded plot . . . would conclude that what is now the defendant's lot was a part of the land dedicated by the plot as a [portion of plaintiff's housing block].").

194. See Ex. 2 to Mot. to Intervene (D.I. 67), at ¶ 8.

195. See Regency Group, Inc. v. New Castle County, 1987 WL 1461610, at * 1 (Del. Ch. Dec. 3, 1987) (finding a specific use designation on the Master Plan map alone was not controlling and that land zoned for commercial must only accord with acceptable uses under the County zoning code).

Golf Course minimum acreage requirement. The Distributed Master Plan, for example, references the Master Plan and the restrictions contained therein.[196] As previously established, nothing in the Master Plan requires PCRS set aside any more than 130 acres for development as a golf course.[197] The Distributed Master Plan also contains the disclaimer that the drawing represents "concepts" only, and that modifications were possible, albeit only with the consent of the County Council and in accordance with the Master Plan. While the affidavits confirm residents were shown drawings, they also demonstrate the residents were informed, both by the drawings and the sales representatives,[198] that the 1964 Agreement and the 1969 Amendatory Agreement governed land use in Pike Creek Valley.

Since the Master Plan created the 130–acre restriction, owners have altered the Golf Course acreage multiple times, resulting in a decrease in acreage from the original 199± acres in 1971.[199] The County cannot now, after acquiescing to changes in the total acreage and configuration of the Golf Course over the years, argue that 177 acres must be the inviolate size of the land mass restricted. The Court finds no intent by the parties to support restricting more than 130 acres for development of a golf course, and the County has failed to establish that a common scheme of development governs the imposition of an implied covenant beyond that which is stated in the Master Plan. At any time, the Interested Parties had access to recorded Agreements and recorded plats which reference the Master Plan containing the express terms of the restriction. They cannot now argue that the original and now-operable restriction requires PCRS to maintain additional land for a golf course. Finally, the Interested Parties have no explicit rights under the Master Plan, which states: "no person, firm or corporation other than the parties, LEVY COURT and governmental body enumerated ... shall have any rights whatever arising out of or by virtue of the execution of delivery of this agreement...."[200]

Thus, even assuming the County does have standing to assert the common plan of development claim on behalf of the Interested Parties, the claim ultimately fails. "At the core of the common plan doctrine is the intent of the parties."[201] The Court can find neither evidence of an implicit intent to restrict the land for potential golf course use beyond 130 acres, nor an implied assignment of rights to parties outside the Master Plan. The Motion to Intervene is **DENIED.**

### C. PCRS has not met its burden of demonstrating that mandamus should lie here.

"Mandamus is an extraordinary writ used to compel performance of a duty by an administrative agency," public body, or public official[202] which the Superi-

---

**196.** [A334].

**197.** See Part V.B.1., *supra.*

**198.** See, e.g., Ex. 1 to Mot. to Intervene (D.I. 67), at ¶ 4–6; Ex. A to Ex. 1 to Mot. to Intervene (D.I. 67); Ex. 3 to Mot. to Intervene (D.I. 67), at ¶ 2.

**199.** See PCRS Supp. Letter, Nov. 23, 2011 (and accompanying exhibits) (D.I. 68).

**200.** 1964 Agreement at art. 3.

**201.** *Greylag 4 Maintenance Corp. v. Lynch–James,* 2004 WL 2694905, at *6 (Del. Ch. Oct. 6, 2004)

**202.** *Pleasanton v. Hugg,* 2010 WL 5313228, at * 1 (Del.Super.Ct. Nov. 29, 2010); *see Guy v. Greenhouse,* 1993 WL 557938, at *1 (Del. Dec. 30, 1993); *Darby v. New Castle Gunning Bedford Educ. Ass'n,* 336 A.2d 209, 209–10 (Del.

or Court will issue only where the petitioner has demonstrated a "clear legal right to the performance of a non-discretionary duty." [203] Petitioners do not have a right to a writ of mandamus; it will issue only in the exercise of the Court's sound discretion. [204] But as a condition precedent to the issuance of a writ of mandamus, a petitioner must demonstrate that: (1) it has a clear right to the performance of a duty imposed by law; (2) the entity against which the writ is sought has arbitrarily failed or refused to perform that duty; and (3) no other adequate remedy is available to the petitioner. [205] In turn, a writ of mandamus will only issue to require the performance of a clear legal or ministerial duty, that is, a duty "prescribed with such precision and certainty that nothing is left to discretion or judgment." [206] And the petitioner must demonstrate an arbitrary failure or refusal to perform that duty. [207] Lastly, the Court will not issue a writ where a petitioner has an adequate remedy at law. [208] In fact, mandamus will not lie unless the petitioner has no other remedy. [209]

PCRS wishes the Court to issue a writ of mandamus directing the County to approve the previously submitted plans for the Terraces and the Hogan Drive lots. To compel PCRS to undergo the Restriction Change process as required by UDC § 40.31.13, PCRS argues, would be futile. [210] The County argues the opposite: PCRS has failed to demonstrate that the process would be futile, and thus the County code requires PCRS to exhaust all administrative remedies before bringing any court action. [211] And further, says the

---

1975); *Remedio v. City of Newark*, 337 A.2d 317, 318 (Del.1975); *Acierno v. New Castle County*, 2004 WL 745715, at *2 (Del.Super.Ct. Apr. 7, 2004).

**203.** *Remedio*, 337 A.2d at 318.

**204.** *Guy*, 1993 WL 557938 at * 1 (citing *Ingersoll v. Rollins Broadcasting*, 272 A.2d 336, 338 (Del.1970)); *Acierno*, 2004 WL 745715, at * 2.

**205.** *McCoy v. State*, 36 A. 81, 83 (Err. & App.1897) (mandamus is "a remedial writ, the appropriate functions of which are the enforcement of the performance of duties, imposed by law, by officers and others who neglect or refuse to perform their duty.... [I]f there be any other specific and adequate legal remedy" the writ will not be allowed); *see Schagrin Gas Co. v. Evans*, 418 A.2d 997, 998 (Del.1980); *see also Petition of Hyson*, 649 A.2d 807, 808 (Del.1994) (describing "condition precedent" to Supreme Court's issuance of mandamus).

**206.** *State ex rel. Abbott v. Calio*, 2004 WL 2520906, at * 1 (Del. Nov. 4, 2004); *Guy*, 1993 WL 557938 at * 1 (citing *Darby*, 336 A.2d at 211).

**207.** *In re Anderson*, 2012 WL 5990220, at * 1 (Del. Nov. 29, 2012); *In re Bordley*, 545 A.2d 619, 620 (Del.1988) ("[I]n the absence of a clear showing of an arbitrary refusal or failure to act, this Court will not issue a writ of mandamus....").

**208.** *Acierno*, 2004 WL 745715, at *2.

**209.** *Brittingham v. Town of Georgetown*, 2011 WL 2650691, at * (Del.Super. Ct. June 28, 2011); *Pleasanton v. Hugg*, 2010 WL 5313228, at * 1 (Del. Super. Ct. Nov. 29, 2010).

**210.** PCRS also argues that the Resolutions passed by the County Council opposing development on the Golf Course land, *see* Part I, *supra*, are void *ab initio*. PCRS Mot. at 47. As has been explained in Part V.B.iii., above, the Court will not defer to the County's interpretation of the restrictive covenants where there is an adverse party challenging the County's position. Thus, the Court has essentially declared those portions of the Resolutions void.

**211.** *See Levinson v. Delaware Compensation Rating Bureau, Inc.*, 616 A.2d 1182, 1190 (Del.1992); *Toll Bros., Inc. v. Wicks*, 2006 WL 1829875, at *8 (Del. Ch. June 21, 2006).

County, in the absence of compelling circumstances, a Court should not intervene in a legislative and/or executive process before the legislative and/or executive authority is permitted to comment on the meaning of its own regulations or otherwise perform its duty under applicable law.[212]

Failure to meet any of the several conditions precedent to issuance of a writ of mandamus renders the grant of such extraordinary relief inappropriate.[213] PCRS first fails to adequately demonstrate that it has no other remedy available.

▮▮▮▮ Under the exhaustion doctrine, "where a remedy before an administrative agency is provided, relief must be sought by exhausting this remedy before the courts will either review any action by the agency or provide an independent remedy."[214] Under Delaware Law, there is a strong presumption in favor of exhausting administrative remedies.[215] The doctrine "allows administrative bodies to perform their statutory functions in an orderly manner without preliminary interference from the courts...."[216] Still, in certain circumstances, including where administrative review would be futile, exhaustion is not required.[217] This is not one of those circumstances.

PCRS faces a high burden to demonstrate futility.[218] In *Salem Church (Delaware) Association v. New Castle County*, the Court found the rare instance where the plaintiff overcame the strong presumption in favor of administrative exhaustion.[219] There the Court determined an appeal by Salem Church would have been futile because the clear and unambiguous meaning of a contradictory statute would prevent the Planning Board from interpreting that statute in any way not adverse Salem Church.[220] Not so here.

▮▮▮ The Restriction Change Statute requires petitioners, such as PCRS, who wish to alter the restrictions to which the County was a party or a beneficiary, to submit to the statutory Restriction Change

212. *Hundley v. O'Donnell*, 1998 WL 842293, at * 4 (Del. Ch. Dec. 1, 1998) (A "democratically elected body should, in the absence of compelling circumstances, be allowed to speak to the meaning of their own ordinances, including a legal interpretation, within the factual context of this case.").

213. *See Washington v. Dep't of Corr.*, 2006 WL 1579773, at * 2 (Del.Super. Ct. May 31, 2006).

214. *Levinson*, 616 A.2d at 1187 (citing 2 Am. Jur. 2d. *Administrative Law* § 595 (1962)); *see Salem Church (Delaware) Assoc. v. New Castle County*, 2006 WL 2873745, at * 4 (Del. Ch. Oct. 6, 2006) (same); *Eastern Shore Environmental, Inc. v. Kent County Dept. of Planning*, 2002 WL 244690, at *5 (Del. Ch. Feb. 1, 2002) (same).

215. *Levinson*, 616 A.2d at 1190. *Salem Church*, 2006 WL 2873745, at *4; *Pleasanton v. Hugg*, 2010 WL 5313228, at * 1 (Del.Super.Ct. Nov. 29, 2010); *Hundley*, 1998 WL 842293, at *2.

216. *Levinson*, 616 A.2d at 1190.

217. *Id.* ("[E]xhaustion will not be required where administrative review would be futile, where there is a need for prompt decision in the public interest, where the issues do not involve administrative expertise or discretion or where irreparable harm would result from the denial of immediate judicial relief."); *see Salem Church*, 2006 WL 2873745, at * 4 (same).

218. *Salem Church*, 2006 WL 2873745, at *5; *Kejand, Inc. v. Town of Dewey Beach*, 1996 WL 422333, at *3 (Del. Ch. July 2, 1996).

219. 2006 WL 2873745, at * 5.

220. *Id.* at * 6 (The Senate Bill in question was unambiguous, thus the Planning Board could not have legally construed the amended statute in favor of Salem Church, and any attempt by Salem Church to appeal the Planning Board's ruling would have been futile.).

process.[221] PCRS chose not to pursue that avenue, presumably based on its belief that no use restrictions on the Golf Course exist.[222] Now, however, having pursued this action to compel the County to approve the proposed Hogan Drive and Terraces plans by positing that no restrictions exist, PCRS cannot rely on the County's opposition to the lawsuit as a basis to claim the restriction change process would be futile.[223] And now given the Court's holding regarding the limitations on the applicable restriction, the County's position certainly may change. In short, PCRS has never made its case for the necessary restriction change under the applicable provisions of the UDC. That UDC process affords PCRS defined avenues prescribing review by the Planning Board and the County Council. Consequently, PCRS' futility argument must fail.[224]

PCRS' second failure is its inability to demonstrate that the County and its administrative bodies have arbitrarily failed or refused to carry out its legally-imposed duty. The process of its Hogan Drive and Terraces application described below make this manifest. Lastly, the Court is not convinced that PCRS' complaints, at this point, implicate "a clear legal right to the performance of a non-discretionary duty."[225] Thus, the extraordinary remedy of a writ of mandamus is not warranted.[226]

**D. PCRS cannot avoid the applicable County approval processes via the presumption statute, *res judicata*, collateral estoppel, or by claiming violations of constitutional guarantees.**

**1. The presumption statute does not apply and will not serve as a mechanism for automatic approval of the subdivision plan submitted on October 14, 2010.**

 Under Delaware Law, for any matter requiring submission to the County Department of Land Use or the County Planning Board, "approval shall be presumed," unless either the Department or Planning Board acts within 45 days.[227] PCRS claims that the County's delay in acting on their October 14, 2010 Hogan Drive submission renders the submission

---

221. UDC § 40.31.130.

222. *See* Oral Arg. Tr., Nov. 16, 2011, at 60–61 (PCRS Counsel: "I'll just say, frankly, it was an unrecorded document and I was also aware of the entire context of this. Did I think that that was a restrictive covenant? Absolutely not.").

223. *See Levinson v. Delaware Compensation Rating Bureau, Inc.*, 616 A.2d 1182, 1190–91 (Del.1992) (an administrative hearing is not necessarily futile where the ruling body articulates a pre-hearing statement contrary to the interests of the petitioner) (citing *Federal Trade Comm'n v. Cement Institute*, 333 U.S. 683, 700–03, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) and *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)).

224. *Hundley v. O'Donnell*, 1998 WL 842293, at *4, n. 5 (Del. Ch. Dec. 1, 1998) ("This futility argument fails, however, in light of ... the County Code which provides that Plaintiff can appeal the [Dep't of Land Use]'s decision to the Planning Board and, if necessary, the County Council....."). PCRS does not convincingly advocate, nor does the record support any of the other exhaustion relieving circumstances: that a prompt decision is in the public interest, that there are issues not involving administrative expertise or discretion, or that delay would cause irreparable harm. *See Levinson*, 616 A.2d at 1190–91.

225. *Remedio v. City of Newark*, 337 A.2d 317, 318 (Del.1975).

226. *See* n. 205, *supra*.

227. DEL. CODE ANN. tit. 9, § 1309. A similar provision in the UDC requires the Dep't of Land Use to issue its decisions on submissions in writing within twenty days. UDC at § 40.31.330.

approved.[228] The County challenges PCRS' claim on three grounds: (1) the Department of Planning did not have jurisdiction to act on the October 14th submission during the 55–day period between the submission and the Department's comments because PCRS incorporated the October 14th submission into an appeal before the County Council; (2) the presumption statute can, and should, be rebutted where no bad faith or dilatory delay is evidenced; and, (3) any plan found to be in violation of other laws or regulations cannot be presumed to be approved. Because the presumption of approval can be rebutted, and the October 14th submission failed to comply with the County development code, the County prevails.

On June 25, 2010, the Land Use Department received an engineering submission for the Hogan Drive Townhouse Addition.[229] In a letter dated September 23, 2010, and authored by a Department Planner, the Land Use Department informed PCRS that their application required submission of a resubdivision plan.[230] On October 14, 2010, the Land Use Department received the previously-requested revised drawings, along with several other documents.[231] Soon after, PCRS administratively appealed the September 23rd letter to the County Planning Board, and when doing so, incorporated the plans that were submitted on October 14, 2010.[232] A Planning Board hearing was scheduled for December 7, 2010.[233] On October 19, 2010, the Land Use Department, through an assistant general manager and the assigned planners, decided to defer their decision on the October 14, 2010 submission until the Planning Board ruled on the pending appeal.[234] That decision was logged in the Land Use Department's application tracking software.[235] Only after PCRS filed for a writ of mandamus in Superior Court, did the Land Use Department issue its comments relating to the October 14th submissions, out of an abundance of caution.[236]

Regardless of whether PCRS' appeal of the Land Use Department's September 23, 2010 letter truly divested it of jurisdiction to review the plans for technical compliance, the Department reasonably concluded that, "the ultimate design of the subdivision depended on the outcome of the appeal before the Planning Board." [237] PCRS has not demonstrated that the Land Use Department's actions in postponing review of the October 14th submission was either purposeful or dilatory.[238] To the contrary, an apparently routine "note to file" made on October 19, 2010 in the

228. The Dep't of Land Use issued a letter with comments on December 7, 2010, 55 days following the original submission. Dep't of Land Use Letter re: Hogan Drive Townhouse Addition, Dec. 7, 2010. [A396–98].

229. Aff. of George O. Haggerty, Jr., Sept. 6, 2011, at ¶ 4. [A318].

230. *Id.* at ¶ 5. [A318].

231. *Id.* at ¶ 6. [A318].

232. *Id.* at ¶ 7. [A318].

233. *Id.* [A318].

234. *Id.* at ¶ 8. [A318].

235. Ex. A to Aff. of George O. Haggerty, Jr., Sept. 6, 2011. [A321].

236. Aff. of George O. Haggerty, Jr., Sept. 6, 2011, at ¶ 9. [A319].

237. *Id.* at ¶ 8. [A318].

238. *See Cicchine v. Township of Woodbridge,* 413 N.J.Super. 393, 995 A.2d 318, 322 (Law. Div.2010) ("The automatic approval is intended to remedy bad faith or overreaching or dilatory conduct of the Board. It should not be applied when the inaction was inadvertent or where there is no evidence of intentional delay or inattention to the application.").

Department's application tracking software, clearly evidences its intention to place the application on hold until the Board appeal was decided.[239] Moreover, the Department's December 7, 2010 letter makes clear that the plans as submitted on October 14th did not comply with County regulations and required amendment before they could be approved. Thus, the plans were never valid on their face and would in any case necessitate additional regulatory review.[240] There is no reason to believe that with the restriction no longer at issue for the Hogan Drive lots, that the County would not undertake its regulatory review in good faith and due course.[241] As such, PCRS cannot rely upon the presumption statute as a basis for relief here.

**239.** Ex. A to Aff. of George O. Haggerty, Jr., Sept. 6, 2011 ("10/19/2010 12:00 Per meeting w/ GOH [the assistant general manager] and MB [the assigned planner], plan review placed on hold until planning board appeal is completed."). [A321].

**240.** Dep't of Land Use Letter re: Hogan Drive Townhouse Addition, Dec. 7, 2010. [A396–98]. *See Beiser v. Board of Adjustment of Town of Dewey Beach*, 1991 WL 236966, at * 5 (Del.Super.Ct. Oct. 25, 1991) (an invalid permit is invalid *ab initio* ); *Miller v. Board of Adjustment of Town of Dewey Beach*, 521 A.2d 642, 647 (Del.Super.Ct.1986) ("A permit issued illegally, or in violation of the law, or under a mistake of fact, does not confer a vested right upon the person to whom it is issued.").

**241.** Courts have long held that government officials are presumed to carry out their duties in an appropriate manner. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926) ("The presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *see also Schism v. United States*, 316 F.3d 1259, 1302 (Fed.Cir.2002) (citations omitted) ("This presumption of regularity is the supposition that public officers perform their duties correctly, fairly, in good

## 2. Principles of *res judicata* and collateral estoppel do not require this Court to issue a writ of mandamus ordering the Department and the Planning Board to review the contents of PCRS' October 14, 2010 submission.

 PCRS argues that principles of *res judicata*[242] and collateral estoppel[243] require this Court to issue a writ directing the County, and specifically the Department of Land Use, to review the subdivision plans. Where a court has previously adjudicated the issues and rights at bar, PCRS contends, a party should not be permitted to re-litigate. Specifically, PCRS relies on *Regency v. New Castle*

faith, and in accordance with law and governing regulations, and is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.' "); *Dukes v. Shell Oil Co.*, 177 A.2d 785, 793 (Del.Ch.1962) ("[T]here is a presumption of validity to be accorded to the action of the [County administrative and/or legislative bodies].").

**242.** *See Bailey v. City of Wilmington*, 766 A.2d 477, 481 (Del.2001) ("Under Delaware law, a party claiming that the doctrine of *res judicata* bars a subsequent action must demonstrate the presence of five elements: (1) the court making the prior adjudication had jurisdiction, (2) the parties in the present action are either the same parties or in privity with the parties from the prior adjudication, (3) the cause of action must be the same in both cases or the issues decided in the prior action must be the same as those raised in the present case, (4) the issues in the prior action must be decided adversely to the plaintiff's contentions in the instant case, and (5) the prior adjudication must be final.").

**243.** *See Whittington v. Dragon Group L.L.C.*, 2011 WL 1457455, at *6 ("Issue preclusion applies if: (1) the same issue is presented in both actions; (2) the issue was litigated and decided in the first action; and (3) the determination was essential to the prior judgment.").

*County*[244] for the proposition that the County is estopped from arguing the Master Plan establishes enforceable restrictions.[245] As described before, in *Regency* the Court prevented the County from restricting the use of a plot of land to a "Motor Inn" solely because the recorded plan map labeled the plot "Motor Inn Site." It relied on language in the 1964 Agreement stating "acreage set aside for commercial use on the updated Master Plan and rezoned for that purpose ... shall be utilized for the land uses and purposes described in the zoning Code of New Castle County...."[246] The Court reasoned that the language of the 1964 Agreement created some ambiguity as to the original owners' intentions with respect to the Motor Inn Site, and that any ambiguity must be construed against grantor.[247] Importantly from PCRS' perspective, the Court found the County had, on numerous occasions, "acquiesced in and permitted uses by other owners of other designated sites that are inconsistent with their corresponding Master Plan designations."[248] PCRS now argues the Master Plan creates no enforceable restrictions[249] and enforcing any supposed restrictions against it as current owner would be inequitable. Such claims ignore those facts which distinguish the golf course restriction from the general commercial zoning restrictions of the Master Plan. The Court in *Regency* did not find an enforceable restriction as to the "particular plaintiff" wishing to build a shopping center on grounds which the recorded plan map labeled as the "Motor Inn Site." But the Court did not address the issues now raised by the County's opposition to potential development of the Golf Course.[250]

This Court's decision in *Regency* is clearly limited in scope to the "particular plaintiff."[251] Paragraph 12 of the 1964 Agreement, upon which *Regency* relied, specifically carves out, "as the only exception" to the fairly general language permitting development on commercially-zoned land in Pike Creek Valley, that "the area shown on the updated Master Plan set aside for a par 3 golf course if zoned commercial shall only be used for a recreational purpose."[252] In contrast to the Motor Inn designation—a sole notation on a recorded plan map which the Court did not uphold—the golf course use designation is both noted on the recorded plan and specifically carved out and set aside[253] in Article 12 of the 1964 Agreement.[254] Even *Regency* acknowledged "the contracting parties ... intended to permit commercially zoned land (*other than the golf course*) to be used for any purpose allowed by the applicable zoning classification."[255] Noth-

---

**244.** 1987 WL 1461610 (Del. Ch. Dec. 3, 1987).

**245.** PCRS Op. Brf. in Support of Pet. for Writ of Mandamus, Aug. 5, 2011, at 28. *See* D.I.* 1.

**246.** *Regency Group, Inc. v. New Castle County*, 1987 WL 1461610, at * 1 (Del. Ch. Dec. 3, 1987).

**247.** *Brookside Community, Inc. v. Williams*, 290 A.2d 678, 680 (Del.Ch.1972); *see Regency*, 1987 WL 1461610, at * 2.

**248.** *Regency*, 1987 WL 1461610, at * 2.

**249.** *See* Part V.B., *supra*.

**250.** *Regency*, 1987 WL 1461610, at * 1.

**251.** *Id*.

**252.** *Id*.

**253.** *See* n. 124, *supra*.

**254.** Article 12 as amended by the 1969 Amendatory Agreement replaces the phrase "par three" with "18–hole." 1969 Amendatory Agreement at art. 9.

**255.** *Regency*, 1987 WL 1461610, at *2 (emphasis added).

ing in the Court's *Regency* decision precludes the finding of a restrictive covenant, as the Court has interpreted it above, limiting development on a certain portion of the land on which the Golf Course is situated.

Nor can *G.R.G. Realty Co. v. New Castle County*,[256] support PCRS' collateral estoppel and *res judicata* claims. *G.R.G. Realty* involved the isolated issue of whether mandamus should issue, requiring the Department to exercise its "stated duties" to review development plans, even where legal issues outside its expertise and scope arise.[257] In granting the limited writ and instructing the Department to review the plans "as to content," the Superior Court expressly reserved decision on the contested legal issues.[258] The *G.R.G. Realty* decision did not reach the restrictive covenant or the County's third-party beneficiary rights. Nor did the Court examine the specific language of the Master Plan related to the Golf Course. The *G.R.G. Realty* decision is not controlling here. And the Court cannot find under the instant circumstances that PCRS has demonstrated a "clear legal right to the performance of a non-discretionary duty."[259]

### 3. PCRS' constitutional claims are not ripe for adjudication at this stage.

PCRS raises numerous under-developed arguments claiming the County's position offends constitutional principles governing separation of powers, delegation of powers, due process, equal protection, and private property rights. Without a full record on the multitude of ancillary constitutional claims PCRS raises in its briefs, the Court is ill-prepared to address each in turn. Moreover, the constitutional claims are not yet ripe for, as discussed above, PCRS must exhaust its administrative remedies before bringing its grievance to the Court.[260] Finally, considering the Court's rulings herein related to the enforceability of the restriction created by the Master Plan, such claims may no longer be at issue.

### VI. CONCLUSION

For the reasons stated above: the Interested Parties' Motion to Intervene is **DENIED**; the County's Motion for Summary Judgment is **GRANTED, in PART**; PCRS' Motion for Summary Judgment is **GRANTED, in PART**; and the Petition for a Writ of Mandamus is **DISMISSED**. PCRS is required to follow the Restriction Change Statute where applicable if it wishes to modify the restrictive covenant found by the Court to exist and described above. That restriction cannot be applied to the Hogan Drive Plan. The County and its regulatory and administrative bodies shall not unnecessarily delay review and approval of the Hogan Drive subdivision plans if such are otherwise in conformity

256. 1981 WL 697909 (Del.Super.Ct. Dec. 30, 1981).

257. *Id.* at * 2–3.

258. *Id.* at *3–4 ("[I]f the Court requires the Department to act, the legal issues as to the interpretation of the contracts as to the rights of the third-party beneficiary and as to other legal issues would be left open for eventual determination by a Court.").

259. *Remedio v. City of Newark*, 337 A.2d 317, 318 (Del.1975).

260. The Court has declined to adopt PCRS' claim that pursuing available administrative remedies would be futile. *See* Part V.C, *supra.*

with the County Code and any other applicable regulations.

**IT IS SO ORDERED.**

